Breitel, J.
The issue is whether an unrecorded, unmemorialized, disputed oral agreement to settle an action and proceedings covering a large number of valuable real properties is enforceable. Except for the fact that the agreement was purportedly made in an informal conference before a court clerk and a Judge in a Judge’s chambers, the issue could only be resolved one way, namely, that the agreement was unenforceable. Respondents, in seeking to sustain the oral agreement, rely on CPLR 2104 which requires stipulations to be in writing and subscribed. It excepts, however, stipulations made in “ open court”, which in modern times are recorded by the court reporter. Respondents contend that the settlement comes within the exception.
To establish the fact of the settlement respondents rely on the subsequent colloquy in open court in which the dispute as to the agreement, its conditions, and alleged open-endedness were resolved by the recollections of the presiding Judge and *4 the court clerk. No testimony was taken, and a choice was made between the inconsistent written stipulations proffered by the parties. The stipulation proposed by respondents was imposed on appellants. .
The issue arises between two embattled branches of a family following the death of one of two brothers who together amassed the assets over which there is now dispute. The surviving brother, Israel Dolgin, continued to manage the properties after his brother’s death in 1968. He heads his family group. The opposing group is evidently headed by Jordan H. Dolgin, a son of the deceased brother Morris, joined by Morris’ widow.
Two proceedings for dissolution of close corporations were brought by the Jordan group and an action for specific performance of an earlier settlement agreement was brought by the Israel group. They were later '"consolidated. There are two other actions in Nassau County that were not consolidated. In the consolidated proceeding, by order of June 24, 1971, the Supreme Cburt, after a hearing but without the taking of testimony, adjudged the matters settled and discontinued, and directed allocation of the real properties. The Appellate Division affirmed, without opinion, Gulotta and Benjamin, JJ. dissenting (38 A D 2d 554).
The order should be reversed.
There is no common-law evidence of an agreement to settle, but only concessions as to undisputed terms of an inchoate agreement, at best of an agreement not final until reduced to writing, and, .most important, CPLR 2104 by its terms bars enforcement.
Not involved is the kind of settlement agreement which does not affect a pending litigation and is not required to be. in writing or subscribed under an applicable Statute of Frauds (but, as to executory accords, see General Obligations Law, § 15-501; Goldbard v. Empire State Mut. Life Ins. Co., 5 A D 2d 230, 233-235; 1937 Report of N. Y. Law Rev. Comm., p. 211 et seq.). The term “open court” as it has been used since ancient times and as, it will be suggested, it is used in CPLR 2104, is a technical term in the law. It refers to a judicial proceeding in a court, whether held in public or private, and whether held in the court house, a courtroom, or any place else, so long as it is, in an institutional sense, a court convened, with or *5 without a' jury, to do judicial business. Typically, in a court of record an open court has in attendance a clerk who makes entries of judicial events in a docket, register, or minute book, and in modern times there is a court reporter, who makes a record of all the proceedings. (1 Bouvier’s Law Dictionary [1914 ed.], p. 713.) An open court is not a '‘ judge in chambers ”, in the technical sense of that phrase, and it is neither a Judge nor a clerk acting in his proper person anywhere, whether in the courtroom or elsewhere (3 Bouvier’s, op. cit., supra, p. 2414).
Until 1968 the brothers, Morris and Israel Dolgin, amassed and owned through close corporations and partnerships some 30 real properties of substantial value, those in dispute being fixed at one time at $6,000,000. When Morris died in 1968 his son and widow, individually and as coexecutors under the will, succeeded to his one-half interest. Differences arose between the Jordan group and the surviving brother Israel. WThen efforts at reconciliation failed, the family considered a division of 23 of the properties. After an exchange of letters, a tentative arrangement for division of the 23 properties was reached in 1970 and then disclaimed by the Jordan,group. The Israel group contended, however, that a binding arrangement had been reached.
In February, 1971, the Jordan group began the litigations mentioned earlier. In each action and proceeding the Jordan group, among other relief, sought^-an accounting since the management, after Morris ’ death, had remained in the hands of Israel Dolgin. The Israel group brought its separate action in Kings County seeking specific performance of the purported settlement agreement reached in 1970. The dissolution proceedings and the action for specific performance, all in Kings County, were consolidated by consent (order dated May 12, 1971, per Di Giovanna, J.). The consolidated proceeding was scheduled for pretrial conference on June 10 and trial on June 15.
The June 10 conference began with a preliminary discussion with the clerk at Special Term. The conference with the Justice assigned, in his chambers, followed, at which, unquestionably, an oral agreement of some kind to settle the consolidated pro *6 ceeding was reached. There was no record or writing to evidence the agreement, and the Judge directed the parties td prepare a stipulation of settlement. On June 15, each side submitted a proposed stipulation, substantially identical except that the Jordan stipulation provided for an accounting by Israel and deferred the exchange of general releases. On June 16, for the first time, in open court, with a court reporter present, the parties appeared before the presiding Justice. The court found that an accounting had not been discussed during negotiations in his chambers and held the Israel proposed stipulation binding.
It is significant, and was especially noted by one of the dissenters at the Appellate Division, that despite its rejection of the recollections of the Jordan group, the court determined, on the consent of the Israel group, and provided in its order that the Jordan group would have a time-limited inspection of the books affecting the properties, to cover only the last year of Israel’s management. There was further provision for application to the court for inspecting the books beytínd the one-year period, if serious wrongdoing were uncovered during the test period.
The Jordan group justifies its concern over the period of Israel’s exclusive management because they have received only uncertified statements from the accountant, and have been refused better evidence of the financial history since Morris’ death in 1968. They also assert that the estates and trusts may not accept, without better proof, the description of financial events since 1968, lest they fail in their fiduciary obligations.
The record of the colloquy on June 16 demonstrates a flat contradiction among the parties, the court clerk, and the presiding Justice as to the scope and intention of the oral agreement in chambers.
On the initial discussion with the court clerk on June 10, according to the clerk, an accounting as part of any settlement was brought up. Notably, the petitions in the proceedings also requested an accounting. It was then, again according to the clerk, that the conference was continued in the Justice’s chambers where the parties agreed to a division of the 23 properties. The Judge instructed the parties to reduce their agreement to writing because real property was involved and the most advan *7 tageous exchange for tax purposes was yet to be considered.
A part of the recorded colloquy on June 16 is revealing:
“ [The Clerk]: If I may, when we had reached an impasse on the Richardson and the Sutphin and Jamaica and the Elton Street properties, all sorts of other questions started to come up and at that point I called your Honor in.
“ [The Justice]: Was one of the questions that came up the right to an accounting?
“ [The Clerk]: Yes. And one of the things that I said was that if there was going to be an accounting there would be no settlement, because it was not in the pleadings and it was not before us and it was not in the settlement.
“ And I will testify that you did ask if there was anything else open and Mr. Jordan said no, and it was my understanding that the settlement was for all purposes and that we were not going to open up that question again; otherwise there was nothing.
“ [Counsel for Jordan]: Your Honor, the pleadings do ask for an accounting, and the question was discussed with [the clerk]. The settlement before your Honor was focused primarily upon the properties and the seventeen thousand five hundred dollars.’?
The Jordan group admitted that the request for an accounting was not repeated at the conference with the Justice but argued that the function of the conference in chambers was limited to working out a division of the 23 properties leaving the matter of an accounting, general releases, and problems over jurisdiction of the several estates and trusts involved to be worked out. The Judge’s assistance was sought, the Jordan group said, only in agreeing on how the properties would be divided.
It is of interest that the skeletal 1970 division came to naught because the Jordan group contended that there had been a nondisclosure by Israel Dolgin of an encumbering, long-term, renewable lease on one of the properties. The division worked out in the Judge’s chambers is much like the 1970 division, but there are changes, including a shift from the Jordan group to the Israel group of the property subject to the long-term lease.
Still in the colloquy, the Judge and the court clerk disagreed with the Jordan group. It was the clerk’s recollection that an accounting was an issue in the preliminary discussion, but not in chambers, and that in chambers the Jordan group said *8 that no questions remained open. While an accounting was at one time mentioned, the Jordan group, he says, in effect abandoned the point, on his forecast that otherwise there would be no settlement. The Judge stated that on no occasion before him did any party condition a settlement on an accounting, or any other matters, although the tax incidence of the transfers had to be worked out.. It was also observed by the Judge that at the June 10 meeting he had stated that the settlement wa- i’* all intents and purposes a settlement arrived at in open court with the same force and effect as though, instead of meeting in chambers, we were meeting in the courtroom in open court. ’ ’
The court then held the stipulation proposed by the Israel group final and binding. Appellants, the Jordan group, urge that an oral agreement made in chambers is not enforceable, and, irrespective of a writing requirement, the parties did not agree, and certainly did not agree finally, to all the essential terms necessary for a final settlement. The Israel group concedes that CPLR 2104 is applicable, but that the agreement in chambers is analogous to and enforceable as an agreement in “ open court
The parties have correctly accepted the prevailing rule that stipulations of settlement, as distinguished from stipulations limited to the management of the litigation, also must comply with CPLR 2104 (e.g., Solins v. Klosky, 8 A D 2d 848; Anders v. Anders, 6 A D 2d 440; Ariel v. Ariel, 5 A D 2d 168; Cook v. Bianco, 226 App. Div. 691; but see Langlois v. Langlois, 5 A D 2d 75, 78-79; Lloyd v. R. S. M. Corp., 225 App. Div. 85, 89, revd. on other grounds 251 N. Y. 318; Smith v. Bach, 82 App. Div. 608; see, generally, 2A Weinstein-Korn-Miller, N. Y. Civ. Prac., ¶ 2104.03; 2 Carmody-Wait, 2d, New York Practice, Stipulations, § 7:7).
Assuming that there was a complete agreement, definite and intended to be binding, the question is whether it is enforceable under CPLR 2104, and, not raised .by the parties, under the Statute of Frauds (General Obligations Law, §§ 5-703,15-501)*. *9 CPLR 2104 reads: ‘ ‘ An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.”
The subscribed writing requirement for stipulations is said to have been the rule since 1796 (People v. Stephens, 52 N. Y. 306, 310). Rule XI of the General Rules of Practice under the Code of Civil Procedure was substantially similar to CPLR except that no exception was made for stipulations made in open court (see Chase, Code Civ. Pro. [1920 ed.], rule XI, p. 1443).
The Rules of Civil Practice, an adjunct to the Civil Practice Act, continued former rule XI, also without an exception for stipulations made in open court (Rules Civ. Prac., rule 4 [1920]). The open court exception was not added until 1921 (Parsons’ and Clevenger’s Practice Manual, 1923, Rules of Civ. Prac., p. 7, rule 4 and aim.). The Rules Convention Report does not attribute any special purpose, to the amendment, but it was no doubt intended to codify existing case law which customarily enforced; stipulations made in open court (Report, Convention to Adopt Rules of Civil Practice [1921], pp. 11-12).
The rule had always been that oral stipulations or concessions made in open court, despite statutory or rule requirements for writings, would be enforced over the objection of lack of a subscribed writing (Corning & Horner v. Cooper, 7 Paige Ch. 587, 588; Jewett v. Albany City Bank, 1 Clarke Ch. 241, 247-248; Banks v. American Tract Soc., 4 Sandf. Ch. 467; Keator v. Ulster & Delaware Plank Road Co., 7 How. Prac. 41, 42-43; Staples v. Parker, 41 Barb. 648, 650; People v. Stephens, 52 N. Y. 306, 310-311, supra; Slaven v. Germain, 64 Hun 506, 508). Notably, all the cases involved oral stipulations made in open court in the course of judicial proceedings before the court. Some stipulations were reflected in the clerk’s , minutes, and in at least one instance in a master’s certificate. None involved stipulations outside the courtroom or outside formal judicial proceedings.
Particularly, the open court exception, necessary, it is repeated, only when there is no subscribed writing or other record to evidence the stipulation, does not extend to a conference in a Judge’s chambers, even in these days of judicial *10 intervention in settlement negotiations (People ex rel. Putziger v. Putziger, 22 A D 2d 821; Rosen v. Grand, 6 A D 2d 799, 801; Accarino v. Hirsch, 6 A D 2d 795, 797; Brozyna v. Andreshi, 6 A D 2d 601, 603; cf. Royal Globe Ins. Co. v. Dinan, 42 Misc 2d 595, 598; but see Gass v. Arons, 131 Misc. 502, 503-504 [City Ct., Bronx County], applying an estoppel to a prejudicial, repudiated, oral stiplation in chambers; see, generally, 2A Weinstein-Korn-Miller, N. Y. Civ. Prac., ¶ 2104.03, at p. 21-32; 2 Carmody-Wait, 2d, New York Practice, Stipulations, § 7:5, at p. 12; Ann., Stipulations — Form Requirements, 7 ALR 3d 1394, esp. 1399-1402).
Judicial proceedings in “ open court ”, wherever held, including chambers of course, and informal conferences in chambers or robing rooms or even a courtroom are manifestly disparate. Even before full reporting in open court became universal in courts of record, the formality, publicity, and solemnity of an open court proceeding marked it as different from the preliminary atmosphere attached to informal conferences elsewhere. Moreover, the proceedings in open court would always have some formal entries, if only in the clerk’s minutes, to memorialize the critical litigation events. In the latter days, it has also meant an available full transcript beyond dispute and the fallibility of memory. Indeed, some. States require an entry in the court minutes before an oral stipulation even in open court may be enforced (e.g., 16 Arizona Rev. Stat. Ann., Rules of Civil Procedure, rule 80, subd. [d]; 1 Vernon’s Texas Rules of Civil Procedure, rule 11; 15A C. J. S., Compromise & Settlement, § 17). To extend the exception of CPLR 2104 beyond its meaning to cover purported agreements reached elsewhere is to extend a limited exception derived from necessity (yet with significant safeguards) to an uncontrollable area. Moreover, as in this very case, it engenders issues of fact and credibility among the parties, the presiding Justice, and the court clerk, a result not only perilous in ascertaining the facts, but erosive of the dignity of a court and its officers.
Thus far it has been assumed that the agreement in chambers was definite and complete. It was not, even on the recollections of those present. Indeed, this was the thrust of the dissenters at the Appellate Division. Details, hardly minor, with respect *11 to molding the transfers to avail of tax advantages, involving 23 real properties, worth $6,000,000, owned by close corporations and partnerships, had not been resolved. There is dispute and' not agreement whether an accounting by Israel was a condition, whether the condition was mentioned before or after the conference in the Judge’s chambers, when general releases would be exchanged, and whether it was necessary to do anything to bring in the several estates and trusts involved. Nor is thebe any circumstance or language offered which suggests, let alone shows, that there was an intention to be bound before the agreement was reduced to writing. In view of the fact that a prior arrangement, in writing but as skeletal as the later one, had failed to settle the disputes, a new oral agreement to settle would constitute but a precursor to renewed litigation, as indeed has happened. It certainly violates every standard of prudence to expect that the informal conference in chambers constituted or was intended to constitute a definite, complete, and final agreement. At best, it was an agreement to agree to the amplified terms of a future writing (Moylan v. Naylor, 12 A D 2d 854, 855, involving a dictated stipulation in open court; Restatement, Contracts, § 26, Comments a, b; 9 N. Y. Jur., Contracts, §§ 19-20).
Finally, the settlement and disposition of these valuable properties is supported by no competent evidence. There is only the recorded colloquy, six days later, of those present at the prior conference. Nor are the requirements of the Statute of Frauds satisfied. Quite different might be the situation, not involved now, where the facts of the agreement are undisputed and all the elements for an estoppel, including reliance, are present (see Gass v. Arons, 131 Misc. 502, supra; cf. Golden Arrow Films v. Standard Club, 38 A D 2d 813, mot. for lv. to opp. granted, 30 N Y 2d 487).
On the view taken, it is immaterial which of the two contending family groups is correct or whether there is more or less justice on one side or the other. It is critical that transactions of this import, and court proceedings in particular, not be embroiled in inchoate, unprovable arrangements, in which the court or its officers play a part. It is bad enough that men of the practical world indulge in such usages, limited for good *12 reason by Statutes of Fraud; the evil should not be extended to men of the profession and officers of the court.
Accordingly, the order of the Appellate Division should be reversed, without costs, the order of the Supreme Court vacated, and the proceedings remanded.

 There is sparse but persuasive authority that if there is an open court stipulation with all the authenticity it carries based on a supporting transcript, then the Statute of Frauds is not applicable (Anders v. Anders, 6 A D 2d 440, 441-442, supra, affg. 9 Misc 2d 1, 2; Rudolph v. Cinco, 34 Misc 2d 1016, 1017; 56 N. Y. Jur., Statute of Frauds, § 147).