S. Samuel Di Falco, S.
This is an application by one of the executors in this estate for an order directing the committee of an incompetent to sign a settlement agreement pursuant to a stipulation entered on the record in open court. The committee opposes on the ground that she can no longer agree to the terms of the stipulation, and that the stipulation was entered subject to her approval and was not binding.
The committee, as plaintiff, instituted an action in Supreme Court, New York-County, against the then preliminary executors of the estate (the will has since been admitted to probate). This action, transferred here by order of the Supreme Court, seeks damages for breach of contract in the sum of $5,000,000 in behalf of the incompetent, as a third-party beneficiary under a separation agreement entered into between her parents, both now deceased. Incompetent’s father, this decedent, agreed that he would make ‘ ‘ adequate provision in his Will for the maintenance and support of said Marie Meister and for payment of all expenses incurred or to be incurred for her medical care and treatment ”. The separation agreement during the lifetime of the father called for the payment of $2,000 per annum. In his will he provided that the income of a parcel of real property in Hempstead, Long Island, be paid by the trustees in their dis *461 cretion for her care, maintenance and support. The income from this trust for her benefit during the year 1967 was $5,284.14, more than two and one-half times the annual provision for her support agreed upon between the parties during the decedent’s lifetime. A principal issue in this case was whether the provision made by the will was within the intent of the parties. Sharp questions of law and fact were faced by the parties during the time the settlement was in process of negotiation. At the time the settlement was reached the parties were faced with (questions of construction relating to the separation agreement and the will and questions as to the intent of the parties in respect of the obligations of the husband. Under the settlement the incompetent, now 42 years of age, will receive the income of a trust amounting to $300,000 with provision for invasion to the extent of $10,000 a year, totaling $100,000 of that fund. This income amounts to more than five times that which she would take under the will. This estimate does not take into account what will be available out of the $100,000 by way of invasion over the next 10 years. The $300,000 will be funded undiminished by any compensation which is to be allowed to the attorney for the committee. He is to be paid from the general estate, then approximately $1,300,000.
This case was set down for a trial by jury. Long negotiations ensued with my former colleague, Surrogate Aarons, and his staff, and with me and my staff. During these negotiations it was my suggestion that some vehicle for invading the trust be used to provide an additional fund for the care of the incompetent. Mr. Marks, the attorney for the committee, was afforded an opportunity to confer with his client. After due consideration by all counsel and their clients the final conference was held at the courthouse. At that time the agreement of the parties was entered upon the record of this court by the official court reporter.
It cannot be asserted that the committee never agreed to the settlement. Elsie M. Frey, the committee, states in her affidavit in opposition to this motion sworn to October 24, 1972: “In February, 1972, I authorized my attorney, Mr. David L. Marks, to negotiate a settlement of this action pursuant to which the trust for the benefit of Marie Meister provided for in the Will of her father would be increased to the sum of $300,000, and the income from such trust would be paid to or for the benefit of Marie Meister during her lifetime, with certain provisions for invasion of the principal of the trust. ’ ’
Her affidavit tells about what was contemplated in respect of caring for the incompetent in private facilities instead of a State *462 mental institution “ When I authorized the above settlement ”. She later says in the same affidavit: “ [I]n February of 1972 when I agreed to the terms of the proposed settlement ’ ’.
Mr. Marks in his affidavit also in opposition to this motion asserts positively ‘ my former client, had authorized me to accept ”. This settlement was entered into on the record in the court on February 11, 1972 at 1:45 p.m. during the luncheon recess in my chambers before a law assistant. Much is made of the fact that it was not recorded in “ open court The business of this court is transacted with equal force in chambers. Moving the parties into the courtroom which adjoins my chambers for the purpose of dictating the stipulation would give the stipm lation no greater weight. The date when the stipulation was recorded was not a date set for trial but a date set upon the agreement of counsel at their previous meeting for the purpose of coming to the courthouse to place on the record their agreement long considered and long negotiated.
The stipulation called for the execution of a formal writing to be executed by the parties. There was some delay and Mr. Marks, the attorney for the plaintiff, wrote to me on June 19, 1972: “ You may recall that in February, 1972, as a result of your helpful intercession and that of Mr. Turret, an agreement was reached among all parties to settle the above action by increasing the principal of the trust created pursuant to her father’s will for the benefit of Marie Meister to the sum of $300,000, with certain provisions for invasion of principal. Mr. Vaughan has prepared a Compromise Agreement which has been approved by all parties. However, the Agreement has not yet been circulated for .signature because Messrs. Wolf Popper Boss Wolf & Jones, attorneys for the Polish life beneficiaries and remaindermen, are waiting to receive a power of attorney covering one of the infant remaindermen named in the Agreement, and are also awaiting advice as to whether there are any newborn remaindermen whose names should be added as parties.” (Italics supplied). It was not until August 29, 1972 that the committee repudiated the settlement entered on the record. In a letter Mr. Marks referred to the ‘ unreasonable delay in implementing'-’ ’ the settlement as a reason for seeking to withdraw therefrom. Inquiry by the court in June, after Mr. Marks’s complaint, revealed that the delay was occasioned by slow communication with some of the residuary legatees who resided in Poland. It was necessary that it be ascertained by their attorneys in fact that there were no persons recently born whose names should be added to the agreement.
*463 It appears that, having accepted the settlement, the committee now wants to be relieved from its terms. She is really asking to be relieved from terms that she expressly agreed to in court, claiming that she has been prejudiced by the delay and the change of circumstances since February. She says through new attorneys, as Mr. Marks no longer represents her: ‘ When I authorized the above settlement, it was contemplated that Miss Meister would be released from New York State Hospital and would live in an apartment in New York City with a companion. Since February, 1972, I have devoted a great deal of time to investigating specific apartments which would be suitable for Miss Meister and attempting to obtain a trained companion to live with her. I am now firmly of the 'opinion that the income from the increased trust which would be set up pursuant to the proposed settlement would be inadequate to meet expenses necessary and reasonably entailed for Miss Meister’s support and maintenance and for her medical care and treatment under the .circumstances which were contemplated. The provisions for the invasion of principal, subject to the court’s approval, and applicable only in the event of an emergency, would not fill the gap between income from the proposed trust and such necessary expenses.”
What the committee is really saying is that she agreed to a settlement without thoroughly investigating what could be accomplished with the money that would be made available to her. The basis for avoidance of the agreement is stated to be second thoughts occasioned by information available at the time of the agreement but not then considered significant. There is no claim that the legal position or the equities in favor of the complainant have changed since her agreement. She concedes the agreement and the authority which she granted to her attorney. She was aware of the terms of the settlement but, having agreed, now has had a change of heart.
This does not seem to this court to satisfy the committee’s burden to show good cause before she may obtain relief from this stipulation entered into in open court (Matter of Shaver, 282 App. Div. 816 ; Bond v. Bond, 260 App. Div. 781; Matter of Callahan, 106 Misc. 202, affd. 188 App. Div. 944). The committee relies primarily on Matter of Dolgin Eldert Corp. (31 NY 2d 1). In that case the court reversed the Appellate Division and the Supreme Court at Special Term in Kings County in a situation where the court below adjudged that certain matters had been settled in a pending litigation. In the Dolgin case there was a conference before a court clerk and a Judge in a Judge’s *464 chambers. In Dolgin there was great disparity as to what had been agreed to. The opinion in Matter of Dolgin defines the statutory expression “ open court ” as follows: “ The term ‘ open court ’ [is] a record of all proceedings ” (pp. 4-5). In the Dolgin case a written record of the settlement was not made but instead the terms of the agreement were dependent upon the recollections of the Judge, the clerk and the attorneys and such recollections were conflicting. As Chief Judge Fun» stated, the parties were still at odds concerning the terms of the settlement at the conclusion of the conference.
In the case at bar the last conference was conducted in the court chambers, a written record was made by the official court reporter and the parties were in complete accord as to the terms of their agreement. In this case there was no dispute among the parties as to the terms of the settlement. The terms were clearly set forth in minutes entered upon the record by the court reporter after all aspects thereof had been approved by all parties. There was a careful dictation of the terms of the settlement agreement before the court in the courthouse. Our courts have consistently recognized the principle of law that agreements of compromise which settle disputes and end litigation will be enforced.
This plan of settlement grew and developed over a course of several months. Each item thereof was carefully considered by the attorneys. The approval of their respective clients was obtained and the language with respect to each item was carefully chosen and dictated into the court record by counsel with some help from the court. Their purpose in providing that the stipulation be reduced to a writing to be signed by the parties was simply to formalize that which had already been agreed to. An agreement containing essential terms is no less binding if it calls for the execution of a more formal contract. Formalization was thought necessary for protecting the fiduciaries of the estate and the committee and the incompetent from claims by those who had an interest in the expanded trust being created for the incompetent under the settlement agreement.
If CPLR 2104 is to be given any operative effect and is to have any significance in the functioning of the law, this is an instance where this statute is applicable.
There is no problem occasioned by the settlement being made effective as of February 11, 1972 in respect of the payments that were to be made thereunder. This court will so direct under the authority contained in the stipulation making the Surrogate “ the final arbiter of any dispute as to the interpretation of this stipulation ” and further providing that the Surrogate “ shall *465 retain jurisdiction of all parties for the purpose of implementing the same.”
The court holds that the agreement is operative and effectual. The stipulation is approved.