BOARD OF TRUSTEES OF the SHEET METAL WORKERS LOCAL UNION NO. 137 INSURANCE ANNUITY AND APPRENTICESHIP TRAINING FUNDS and the Executive Board of Sheet Metal Workers Local Union No. 137

v.

VIC CONSTRUCTION CORPORATION and Charles Nalbone.

No. 91 CV 2463.

United States District Court, E.D. New York.

June 23, 1993.

Giblin & Lynch (Thomas J. Giblin, of counsel), Union, NJ, for plaintiffs.

Goldwater & Flynn (Kevin Arnold Barry and James L. Goldwater, of counsel), New York City, for defendants.

**464**

MEMORANDUM AND ORDER

NICKERSON, District Judge:

Plaintiffs, the Board of Trustees of the Sheet Metal Workers Local Union No. 137 Insurance, Annuity and Apprenticeship Training Funds (the Funds) and the Executive Board of Sheet Metal Workers Local Union No. 137 (the Union), brought this action alleging that (i) defendant Vic Construction Corporation (Vic Construction) failed to make payments to the Funds in violation of a collective bargaining agreement and section 515 of the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq.* and 1145, and (ii) defendant Charles Nalbone operated Vic Construction as his alter ego and is jointly and severally liable.

Plaintiffs move for an order enforcing an oral settlement agreement.

I

The undisputed facts are these.

On July 2, 1993 the court granted summary judgment to plaintiffs against Vic Construction alone in the amount of $17,813.42, plus reasonable attorneys' fee and costs.

To settle this dispute, Nalbone, the sole shareholder and acting with authority to represent Vic Construction, stipulated at a deposition on January 6, 1993 that plaintiffs are owed $26,935.26, that "the indebtedness is due by Vic Construction Corporation and Charles Nalbone individually, and that Charles Nalbone individually guarantees the payment." The deposition was recorded and transcribed by a certified shorthand reporter.

A stipulation memorializing the agreement of the parties was drafted and provided to counsel for defendants. Defendants refused to sign the agreement, citing the Second Circuit's subsequent decision in *Sasso v. Cervoni*, 985 F.2d 49 (2d Cir.1993). That court, reversing a court in this district, held that an individual is not liable for corporate ERISA obligations solely by virtue of his role as the only officer, director, and shareholder.

Plaintiffs moved for an order enforcing the oral settlement agreement, as expressed in the deposition on January 6, 1993.

II

The parties assume that the oral settlement agreement, if intended to be final, would be binding. The question is not immediately clear. It turns on whether New York or federal common law should govern the validity of an oral settlement agreement resolving ERISA disputes.

A

If New York law were to govern, the court would deny the motion. Rule 2104 of the New York Civil Practice Law and Rules provides that:

An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in a writing subscribed by him or his attorney or reduced to the form of an order and entered.

New York courts have at times mitigated the potentially harsh effect of this rule by finding a "writing" subscribed by a party or attorney contained in correspondence confirming a prior oral agreement. *See, e.g., Morrison v. Bethlehem Steel Corp.*, 75 A.D.2d 1001, 429 N.Y.S.2d 123 (4th Dep't 1980).

New York courts have also estopped parties from invoking the rule when satisfied that the stipulation was made and relied upon, to the detriment of an adverse party. *See Smith v. Lefrak Org., Inc.*, 142 A.D.2d 725, 531 N.Y.S.2d 305 (2d Dep't 1988) (plaintiff discontinued action, consented to a warrant of eviction, and purchased limousine for his new business after defendant orally agreed to settle action for $95,000); *A.J. Tenwood Assocs., Inc. v. United States Fire Ins. Co.*, 104 Misc.2d 467, 470, 428 N.Y.S.2d 606, 607–08 (Sup.Ct. New York Co.1980) (party accepted oral settlement on eve of trial and did not proceed with immediately available trial). *See also In re Dolgin.Eldert Corp.*, 31 N.Y.2d 1, 11, 334 N.Y.S.2d 833, 841, 286 N.E.2d 228, 234 (1972) (observing, in

dicta, that the court might enforce oral settlement agreement with undisputed terms where all elements of estoppel, including reliance, are present).

The settlement agreement here fails to satisfy Rule 2104. It was neither written nor agreed to in open court. The parties have submitted no correspondence or other papers subscribed by defendants or their attorneys that would constitute a "writing" within the meaning of the rule.

Even assuming that, in reliance on the oral agreement, plaintiffs discontinued legal action during the one month before defendants refused to sign the written agreement, this court sees insufficient prejudice to estop the application of Rule 2104. Plaintiffs have not stated that were prejudiced by their reliance on the oral agreement.

### B

The court considers, next, whether federal statutory or common law should govern this dispute. ERISA creates an extensive federal statutory scheme governing the regulation of and litigation concerning employee benefit plans. That scheme does not provide, by its terms, a rule of decision governing the validity of oral settlement agreements.

█ Where, as here, a case falls within the ambit of an extensive federal statutory and regulatory scheme that does not address the precise and narrow issue of litigation, a federal court is competent to fill the void, when appropriate, by fashioning federal common law. *See D'Oench, Duhme & Co. v. Federal Deposit Ins. Corp.,* 315 U.S. 447, 471–72, 62 S.Ct. 676, 686, 86 L.Ed. 956 (1942) (Jackson, J., concurring) ("Federal law is no juridical chameleon, changing complexion to match that of each state wherein lawsuits happen to be commenced.... The law which we apply to this case consists of principles ... selected by us because they are appropriate to effectuate the policy of the governing Act.").

The court must examine "whether there exists a valid substantive federal interest or policy that requires the application of federal law as an exercise of interstitial lawmaking to protect or effectuate the federal scheme." *First S. Fed. Sav. & Loan Assoc. v. First S.*

*Sav. & Loan Assoc.,* 614 F.2d 71, 73–74 (5th Cir.1980). Absent such a federal interest or policy, the federal court should ordinarily "borrow" a state rule of decision. *Id.*

Faced with the question of whether to enforce an oral agreement settling a Title VII case where the state law required a subscribed writing, the Fifth Circuit determined in *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir.1981) that "[n]o significant state interest would be served by absorbing state law as the rule of decision." To the contrary, a state law requirement of a writing hampered the significant federal interest in encouraging voluntary settlement of Title VII claims. *Id.*

In *Gamewell Mfg., Inc. v. HVAC Supply, Inc.,* 715 F.2d 112, 114–15 (4th Cir.1983), the Fourth Circuit collected and analyzed cases declining to borrow state law governing the enforceability of releases and settlements of federal causes of action. It concluded that the cases generally involved federal statutory schemes aimed at rectifying historical inequalities in bargaining power between parties (citing *Parker v. De Kalb Chrysler Plymouth,* 673 F.2d 1178, 1180 (11th Cir.1982) (Truth in Lending Act); *Fulgence,* 662 F.2d at 1208–09 (Title VII); *Jones v. Taber,* 648 F.2d 1201, 1203 (9th Cir.1981) (42 U.S.C. § 1983); *Ott v. Midland–Ross Corp.,* 523 F.2d 1367, 1368–69 (6th Cir.1975) (Age Discrimination in Employment Act)). These cases suggest a "federal solicitude" toward claimants that, prior to the federal legislation, had been inadequately protected by state substantive law. *Jones,* 648 F.2d at 1203.

Courts have also adopted a federal rule where the underlying statutory scheme is advanced by the adoption of uniform rules for settling cases. *See, e.g., Dice v. Akron, Canton & Youngstown R.R. Co.,* 342 U.S. 359, 361, 72 S.Ct. 312, 314, 96 L.Ed. 398 (1952) (federal law determines validity of releases under Federal Employers' Liability Act); *Strange v. Gulf & S. Am. S.S. Co.,* 495 F.2d 1235, 1236 (5th Cir.1974) (federal law determines validity of oral settlement agreements within federal courts' admiralty and maritime jurisdiction).

## C

■ There is a federal interest in remedying unequal bargaining power and in encouraging private settlements and uniformity. On these bases this court concludes that federal common law should govern the validity of settlement agreements resolving ERISA disputes.

Congress enacted ERISA to protect "the continued well-being and security of millions of employees and their dependents" by ensuring that promised benefits are paid. 29 U.S.C. § 1001. It established a mechanism, utilized here, whereby an ERISA plan or union could ask a federal court to enforce an employer's promises to make payments to the plan. 29 U.S.C. § 1145.

Mindful of the burden imposed on federal courts, Congress mandated the establishment of private dispute procedures through which plan beneficiaries and fiduciaries may voluntarily resolve their disputes. 29 U.S.C. § 1133.

And Congress provided for exclusive jurisdiction over disputes, as here, between ERISA plan trustees (or unions) and employers, 29 U.S.C. § 1132(e)(1), thereby encouraging the uniform development of federal common law principles.

In the light of these interests and policies, this court sees no purpose in "borrowing" a state law requirement that settlement agreements be in writing. The application of a wooden state rule that ignores objective evidence that the parties intended to enter a final and binding agreement disposing of an action hardly advances the policies of preserving plan assets, encouraging the private resolution of disputes, and uniformity. It allows an employer, as here, to frustrate the efforts of plan trustees to bring litigation to an end, without providing a corresponding benefit.

Entirely distinct from the substantive federal interests, the Fourth Circuit has pointed to federal procedural interests in adopting a federal rule of decision. That court concluded that "[o]nce a claim—whatever its jurisdictional basis—is initiated in the federal courts, we believe that the standards by which that litigation may be settled, and

hence resolved short of adjudication on the merits, are preeminently a matter for resolution by federal common law principles, independently derived." *Gamewell Mfg.*, 715 F.2d at 115. It went on to fashion a federal rule for rescinding a settlement agreement where a party made a unilateral mistake.

This court need not decide whether federal common law should provide a rule of decision governing the validity of all settlement agreements. Some courts within the Second Circuit have concluded that certain settlement agreements are best tested by state rules. *See, e.g., In re Lady Madonna Indus., Inc.*, 76 B.R. 281, 287 (S.D.N.Y.1987) (declining to apply federal common law to govern validity of oral bankruptcy settlement agreement). But this court concludes that the substantive justification for declining to borrow a state rule of decision may be less compelling where, as here, the court sees a federal interest in the manner by which a case, properly before it, is finally resolved.

The court therefore shall apply a federal common law standard in determining the validity of oral settlement agreements concluding ERISA disputes. *Accord John Boettcher Sewer & Excavating Co. v. Midwest Operating Engineers Welfare Fund*, 803 F.Supp. 1420, 1425–26 (N.D.Ind.1992) (applying federal common law and enforcing oral settlement agreement resolving an ERISA dispute).

## D

■ The Second Circuit articulated several factors in *Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78 (2d Cir.1985) to guide courts in determining whether parties to a litigation intended to be bound by an oral settlement agreement in the absence of a document executed by both sides. While that case purportedly applied New York law (although it did not mention Rule 2104), it drew from general contract principles that sensibly may be applied here.

It stated that four factors that should be considered: "(1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance on the

contract; (3) whether all of the terms of the alleged contract have been agree upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing." *Id.* at 80 (citing *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75–77 (2d Cir.1984); Restatement (Second) of Contracts § 27 comment c (1981)). These circumstances may be shown by "oral testimony or by correspondence or other preliminary or partially complete writings." *Id.*

Defendants contend that the first factor has not met because they did not intend the agreement to be final until it was signed. This contention is not supported by an objective reading of the unchallenged deposition transcript. The transcript shows that Nalbone provided a precise acknowledgment of the obligations owed by himself and his company. Neither he nor anyone else stated that the agreement was anything other than complete, final, and binding. The fact that counsel for plaintiffs stated that he would prepare and send a written agreement renders the oral agreement no less final. "The mere intention to commit an agreement to writing will not prevent contract formation prior to execution." *Winston,* 777 F.2d at 80.

None of the parties appear to have taken any steps, such as paying money, that would plainly confirm a mutual intent to be bound. Nevertheless, plaintiffs took no steps to obtain a court order resolving the issues of attorneys' fees and Nalbone's personal liability. Such inactivity by plaintiffs is consistent with their purported understanding that a final agreement had been reached and, thus, may constitute partial performance.

Significantly, all of the terms of agreement were specified on January 6, 1993. The proposed written agreement that Nalbone refused to sign contains no material additions to or modifications of the January 6th oral agreement.

Last, given the simplicity of this agreement, together with the formality with which it was recorded by a certified shorthand reporter, the absence of a subscribed writing does not suggest that the parties intended it to be anything other than a final and binding agreement.

The court concludes, upon examination of the words and deeds of the parties constituting the objective indicia of their intent, that the parties intended and did orally agree to settle this dispute on January 6, 1993.

### III

Defendants contend that, "in the interest of justice, fairness and equity," the agreement should be rescinded because, at the time of the agreement, they relied upon a decision issued by a court in this district that was subsequently reversed. They cite no authority and offer no legal theory in support of their contention.

Under limited circumstances a court may decline to enforce a contract due to a unilateral or mutual mistake at the time of the agreement. While some courts have declined to apply the doctrine when the mistake was one of law rather than fact, "the modern view is that the existing law is part of the state of facts at the time of agreement." E. Allan Farnsworth, *Contracts* § 9.2, at 649 (1982) (citing *Dover Pool & Racquet Club v. Brooking,* 366 Mass. 629, 322 N.E.2d 168 (1975) (mistake as to zoning law); *Rosenblum v. Manufacturer's Trust Co.*, 270 N.Y. 79, 200 N.E. 587 (1936) (mistake as to terms of trust agreement)). But a "poor prediction of events that are expected to occur" is not a mistake of fact. *Id.* 366 Mass. at 650, 322 N.E.2d 168.

The court declines to apply the doctrine of mistake in this instance. This case involves not so much a mistake of settled law as a failure to determine or predict a controlling interpretation of a statute.

When negotiating an agreement, the attorneys representing the parties are expected to understand the relevant rights and obligations imposed by law. When deciding whether to accept a settlement offer, they must compare the benefit of a certain settlement with the risks and costs of continued litigation. These risks include the chance that laws (including the judicial construction of statutes) may change.

It is true that on August 9, 1991, a court within this district had held an individual liable for corporate ERISA obligations solely

by virtue of his role as sole officer, shareholder, and director. *Sasso*, 985 F.2d at 50. But by January 6, 1993, when this agreement was made, four circuits had reached the opposite conclusion. *Id.* Moreover, the Second Circuit had not decided the question. (Indeed, the Supreme Court has not decided this question.)

Had counsel researched the question of Nalbone's liability before advising him to enter into the settlement agreement, counsel would have discovered that the law was not clearly settled. But even had counsel researched the issue and learned of the uncertainty, counsel nevertheless may have advised Nalbone to accept individual liability rather than assume risks and costs of litigating the issue of whether Nalbone knowingly engaged in wrongful conduct.

If parties can avoid contracts whenever courts clarify or change their interpretation of statutes, thereby altering material assumptions of the parties when accepting a settlement offer, every settlement would be susceptible to rescission due to facts entirely beyond the control of the settling parties. A central purpose of a settlement agreement—to eliminate all such risks while bringing finality to a dispute—would be undermined were courts to rescind agreements under such circumstances.

This court sees no reason to decline to enforce the agreement simply because defendants' counsel relied upon a judicial opinion that was subsequently reversed.

### IV

Plaintiffs' motion seeking an order enforcing the agreement is granted.

So ordered.