No. 85,021

KERMIT E. KRANTZ, *Appellee/Cross-appellant*, v. UNIVERSITY OF KANSAS and KANSAS UNIVERSITY GYNECOLOGICAL AND OBSTETRICAL FOUNDATION, *Appellants/Cross-appellees*.

(21 P.3d 561)

Opinion filed April 20, 2001.

*John C. McFadden*, special assistant attorney general, and *David J. DeSimone*, of DeSimone Pearson, L.C., of Kansas City, Missouri, argued the cause and were on the briefs for appellants/cross-appellees.

*Paul D. Sinclair*, of Sinclair, Sawyer, Thompson, Haynes & Cowing, P.C., of Kansas City, Missouri, argued the cause, and *James J. O'Connell*, of the same firm, was with him on the briefs for appellee/cross-appellant.

The opinion of the court was delivered by

ABBOTT, J.: The University of Kansas and the Kansas University Gynecological and Obstetrical Foundation have filed this interlocutory appeal of the district court's decision rescinding the settlement agreement entered into with the appellee, Dr. Kermit E. Krantz. In its memorandum order, the district court determined that the settlement was based upon a mutual mistake of the law surrounding the tax liability of Krantz. The district court also ordered Krantz to return the money he received as part of his settlement. The district court refused, however, to order Krantz' reinstatement. Krantz has also filed a cross-appeal. This court has jurisdiction pursuant to K.S.A. 20-3018(c).

In June 1993, Krantz, a tenured member of the faculty at the University of Kansas Medical Center (University) and an employee

of the Kansas University Gynecological and Obstetrical Foundation (Foundation), turned 70 years old. At the time Krantz turned 70, K.S.A. 74-4925(d) and the policies of the Board of Regents required the retirement of any faculty member of a state university at the end of the academic year following the member's 70th birthday. At the University, the academic year ends on June 30.

In April 1994, Krantz was notified by the University that it was without authority to renew his tenured appointment with the University. Krantz retained an attorney and threatened to sue the University, arguing that K.S.A. 74-4925 did not apply as it had a sunset provision which forced its expiration on December 31, 1993.

In July 1994, the parties settled all of Krantz' tort, contract, and discrimination claims and executed a separation agreement, release, and waiver of claims. The settlement required the University and the Foundation to provide Krantz with a lump sum payment of $266,365 and to pay his attorney $10,000. The settlement also provided Krantz with continued health benefits and a recommendation of Emeritus status. The settlement agreement contained the following language, which is the focus of this case:

> "The parties intend that the total lump sum payment of $266,365 and the additional consideration referred to in paragraph 1 above represent compensation for any and all of Dr. KRANTZ' alleged personal injuries within the meaning of Section 104(a)(2) of the Internal Revenue Code."

At the time the settlement agreement was executed, 26 U.S.C. § 104(a)(2) (1994) of the Internal Revenue Code permitted the exclusion from "gross income" of "the amount of any damages. . . received on account of personal injuries or sickness."

Neither the University nor the Foundation deducted any taxes from the settlement it paid to Krantz. Krantz did not immediately pay any taxes on the settlement amount received. At the time of the settlement, it was understood that payments in settlement of tort damages were exempt from taxation. Taxation on payment for damages brought pursuant to the Age Discrimination Employment Act (ADEA) had not been addressed by the United States Supreme Court or the 10th Circuit Court of Appeals. Two district courts had held that payments received as damages for ADEA claims were

taxable. See *Maleszewski v. United States*, 827 F. Supp. 1553, 1557 (N.D. Fla. 1993) (holding that settlement reached under ADEA was not excludable from gross income under § 104[a][2]); *Shaw v. United States*, 853 F. Supp. 1378, 1382 (M.D. Ala. 1994) (holding that liquidated damages under ADEA are not excludable under § 104[a][2]). The Supreme Court had, however, held in *U.S. v. Burke*, 504 U.S. 229, 119 L. Ed. 2d 34, 112 S. Ct. 1867 (1992), that payment in settlement of discrimination claims brought pursuant to Title VII is taxable.

One year following the execution of the settlement agreement, the Supreme Court rendered an opinion in the case of *Commissioner v. Schleier*, 515 U.S. 323, 132 L. Ed. 2d 294, 115 S. Ct. 2159 (1995). In *Schleier*, the Court held that money received as a result of an age discrimination claim brought pursuant to the ADEA was not excludable from gross income under § 104(a)(2).

Subsequent to the *Schleier* decision, the Internal Revenue Service (IRS) assessed income taxes against individuals who had received judgments or cash payments in settlement of age discrimination claims, including Krantz. The IRS determined that Krantz' settlement amount was comprised of (1) Foundation salary of $151,681; (2) tenured faculty salary of $46,870; (3) 3 months' termination benefits in the Foundation contract; and (4) $25,145 in back pay for the difference between the amount the Foundation owed Krantz for the first half of 1994 and the actual amount he received. The IRS set forth:

| | |
|---|---|
| "SALARY FOUND | $151,681 |
| KUMC SALARY | 46,870 |
| TERM BENEFITS | 42,512 |
| BACK PAY | 25,145 |
| TOTAL | $266,208 |

"ENDOWMENT PAID $225,000 & FOUNDATION PAID $41,365 OR TOTAL $266,365.

"ARGUE: *Substance over form—Settlement represented a compensation claim under ADEA and therefore was structured to try and evade essence of its purpose by trying to show that it was not subject to tax.*"

The IRS determined, therefore, that the settlement paid to Krantz amounted to compensation and was not for tort-like inju-

ries. Because the settlement represented compensation and not damages for personal injuries, the IRS concluded that the monies were subject to income taxation. The IRS concluded that the parties were "steering [the] transaction purposely to try and define tax laws and prevent payment of taxes."

Krantz paid the IRS and the Kansas Department of Revenue the taxes that the agency claimed he owed on the lump sum settlement with the University and the Foundation. Krantz then contacted the University and the Foundation and demanded reimbursement of the $167,776 he paid in state and federal income taxes. Both the University and the Foundation refused to reimburse Krantz the taxes he payed on his settlement. Krantz thereafter filed suit against the University and the Foundation in Johnson County District Court.

Krantz asserted in his petition that the University and the Foundation breached the settlement agreement by refusing to reimburse him for the taxes paid. Krantz also asserted that a "mutual mistake" by the parties as to the tax consequences of the lump sum payment to him required the settlement agreement to be rescinded, which would permit Krantz to pursue his previously released age discrimination and breach of employment contract claims against the University and the Foundation.

The University moved to dismiss the contract-related claims against it on the basis of the exclusive remedy provisions of the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions (KJRA). The district court granted the motion. In doing so, the district court stated:

"On December 29, 1998, the University advised Krantz by letter that its refusal to pay Krantz for the amounts.demanded constituted final agency action on the part of the University, and it identified the party upon whom service should be made if any petition for judicial review were sought.

"The University filed a motion to dismiss Plaintiff's lawsuit pursuant to the [KJRA], K.S.A. 77-601, *et seq.*, contending that Krantz was required, and failed, to file a petition for judicial review within thirty days of final agency action. The University argues that because a petition for judicial review was Krantz's exclusive remedy, the petition (which contains only common law claims) must be dismissed. Krantz contends that the University's refusal to participate in further settlement negotiations did not constitute agency action within the meaning of the [KJRA].

. . . .

"The focal point of this motion is whether the University's refusal to renegotiate its settlement agreement with Krantz constitutes 'agency action.' . . .

"Administrative agencies are most often creatures of the legislature. They usually operate under the authority of, and with the powers delegated by, the legislature. They are often created to fulfill a specialized role in government. They often have, and in the course of their existence acquire, specialized knowledge and expertise. Their actions are subject to judicial review. However, because of their specialized nature, review of agency determinations is generally limited to determining if the agency acted within its authority and according to the appropriate procedural requirements; and to determining if the agency action is arbitrary, capricious, or an abuse of discretion. . . .

. . . .

". . . The University, in rejecting Krantz's request to negotiate the settlement of his age discrimination claim, had no greater expertise than any other employer . . . in evaluating and deciding this issue. Nevertheless, the University's denial falls into the dragnet of K.S.A. 77-602(b)(3) which defines 'agency action' to include 'an agency's performance of, or failure to perform, any other duty, function or activity, discretionary or otherwise.' As such, the acts of an employer such as the University enjoy judicial scrutiny in the protective environment of the KJRA. Krantz's common law claims, therefore, must fail."

Although the district court found that Krantz' exclusive remedy was through the KJRA and that Krantz had failed to meet the strict statutory criteria, the district court "converted" Krantz' petition into an appeal under the KJRA. The district court stated:

"There remains the question of whether Krantz' s petition filed December 24, 1998, satisfies the requirements of the KJRA so that this action may go forward under the Act.

"K.S.A. 77-614 sets forth the required contents of a petition for judicial review. An examination of the petition in this action demonstrates that it satisfies the requirements of the Act for a petition for judicial review.

. . . .

"The University challenges the propriety of service under the Act. K.S.A. 77-613(e) requires that notice of the agency's action shall be served by mail on the party (Krantz) and his attorney, and shall state the agency officer to receive service of process on behalf of the agency. The letter of John McFadden on December 29, 1998, is the first notice from the University in compliance with this statute. In that letter, Donald Hagen was identified as the agency officer to receive service of process. By that date this action had been filed. On December 30, 1998, Krantz filed a certificate of service by mail for some unidentified documents, presumably the summons and petition, upon Dr. John Calkins, president of the Foundation, and upon the University Chancellor. Thereafter, additional service returns for

undisclosed documents (again, presumably the summons and petition) certify to service upon the Kansas Attorney General and upon McFadden as Special Assistant Attorney General.

"The University notes that strict compliance with the service requirements of the [KJRA] is required for the court to obtain jurisdiction over the University. K.S.A. 77-615 requires service in accordance with K.S.A. 77-613(e) upon (1) the agency head, (2) any other person designated by the agency head to receive service, [and] (3) any agency officer designated to receive service in the agency order. The only reasonable interpretation of K.S.A. 77-615 is that service may be obtained on any one of these three persons. There is no argument advanced that service on the Chancellor does not constitute service on the agency head. Further, K.S.A. 77-615 tells us to look at K.S.A. 77-613(e) for the *manner* of service. K.S.A. 77-613(e) provides that service shall be obtained on the parties to the agency proceeding and their attorneys of record. There is no doubt that this was done. It is interesting that while K.S.A. 77-613(e) requires the agency to state in its final order the officer to receive service of the petition, the statute does not limit service to that person. Thus, Krantz has perfected service in accordance with the [KJRA].

"The petition in this action satisfies the[ KJRA]'s requirements for a petition for judicial review of an agency's final decision."

On August 27, 1999, the district court conducted an evidentiary hearing to determine whether the settlement agreement should be rescinded due to a mutual mistake by the parties over the tax consequences of the lump sum payment to Krantz. On October 12, 1999, the district court issued a memorandum decision rescinding the settlement agreement, allowing Krantz to proceed with his age discrimination and breach of contract claims against the University and the Foundation. The court stated:

"Rescission is the remedy available to parties to a contract entered into through mutual mistake. . . .

"A mistake of law may justify rescission of a contract so long as the mistake is mutual. . . .

. . . .

"Here, plaintiff made it clear to his attorney that he wanted the $266,000 settlement with KU and the Foundation to be net of any taxes. He was told by his attorney that there was no risk of the proceeds being subject to tax. Had any settlement been subject to tax, plaintiff would have demanded in settlement of his claim that he stay on the faculty at his faculty salary. When the IRS later imposed a tax on the settlement proceeds, plaintiff was required to obtain a mortgage on his home to pay the tax. Plaintiff was unconsciously ignorant of the tax consequences of the settlement agreement.

"Negotiations for KU were handled by Vicki Thomas, who testified that early in the negotiations plaintiff's attorney said she wanted plaintiff to be paid in a way that would not subject the settlement proceeds to taxation. Plaintiff's counsel understood that the settlement proceeds would not be included in plaintiff's taxable income, and structured the agreement accordingly. There was significant case authority to support this belief. Finally, defendants did not withhold any tax from the settlement proceeds disbursed to plaintiff. There is no reference in the evidence to defendants including the settlement proceeds in plaintiff's W-2 or in a 1099 report of other income. All sides were unconsciously ignorant of the tax consequences of the transaction.

. . . .

"Here, the taxability of plaintiff's settlement proceeds was not one of the imponderables the parties sought to resolve through the settlement. All sides believed that the settlement they were constructing would not result in taxable income to plaintiff. In making their agreement, the parties assumed the risk that, if litigated, they might enjoy a more favorable outcome. Plaintiff might get more money. Defendants may get a verdict in their favor. That ultimate outcome was a fact of which they were consciously ignorant. Their settlement agreement resolved those imponderable facts. However, the parties were not consciously ignorant of the tax consequences of their agreement. Both sides believed that there would be no tax imposed on the proceeds.

"The parties were mutually mistaken as to the tax consequences of the settlement agreement. Those consequences were significant and warrant the rescission of the contract."

In rescinding the settlement agreement, the district court also ordered that the settlement proceeds paid to Krantz be returned to the University and the Foundation. The district court refused, however, to reinstate Krantz to his former position with the University. The district court stated:

"In the present case, plaintiff had already been terminated as an employee when the release was negotiated and the consideration paid. KU advised plaintiff on April 8, 1994, that his faculty appointment would not be renewed on June 30, 1994. The separation agreement was not executed until July 6, 1994. Thus, to restore plaintiff to the *status quo* that existed at the time the consideration was paid would not require his restoration to his faculty position.

. . . .

"[R]escission has been ordered and there has been no finding of ratification. Rather, our issue is whether the court, having found rescission to be appropriate, should rescind the entire contract or only one side of it.

. . . .

"Having found that the contract of the parties was founded upon an unsound legal premise, of which all sides were unconsciously ignorant, equity requires that

the parties be placed in the position they each enjoyed before the contract was made. That means that plaintiff is free to pursue his age discrimination claims against defendants, and defendants are entitled to the return of the monies they paid plaintiff for his agreement not to do so."

The University and the Foundation now appeal the district court's order rescinding the settlement agreement. Krantz cross-appeals the district court's order requiring him to return all monies received in the settlement to the University and the Foundation.

## I. MUTUAL MISTAKE OF THE LAW

The University and the Foundation argue that the district court erred in determining that the settlement agreement should be rescinded on the basis of the mutual mistake of law doctrine.

The University and the Foundation argue that the standard of review is solely de novo. De novo review is warranted, they assert, because analysis of this case involves interpretation of the settlement agreement, which is a contract.

Krantz argues, on the other hand, that the standard of review in this case is whether the district court's findings of fact are supported by substantial competent evidence. Krantz further asserts that the district court's determination of whether there was a mutual mistake of law is a question of fact. Krantz also argues that the case turns, partially, on the issue of intent and that the parties' intent is also a question of fact which should not be disturbed on appeal if the finding of fact is supported by substantial competent evidence.

Although this case centers on a settlement agreement, which is a contract, the issue we must resolve does not require interpretation of the contract. The issue we are called upon to determine is whether the subsequent decision by the Supreme Court in *Schleier* concerning the taxability of money damages derived from a claim under the ADEA amounted to a "mutual mistake" of the law requiring rescission of the settlement agreement made over a year prior. This is a question of law over which we have unlimited review.

It is an elemental rule that the law favors compromise and settlement of disputes, and generally, in the absence of bad faith or

fraud, when parties enter into an agreement settling and adjusting a dispute, neither party is permitted to repudiate it. However, as an exception to the rule, it is well settled that a compromise settlement may be set aside on the ground of mutual mistake of the parties. *In re Estate of Thompson*, 226 Kan. 437, 440, 601 P.2d 1105 (1979).

Krantz argues that the parties intended for the settlement to be nontaxable. He asserts that the parties were mutually mistaken about the tax consequences of the settlement, thereby requiring rescission of the settlement contract.

In order for a party to claim "mutual mistake of the law," the parties must both be mistaken as to the law at the time the contract is entered into. In the present case, there was no mistake regarding the law at the time the settlement contract was agreed upon. The "mistake" was in the parties' ability to predict how the Supreme Court would decide a future case concerning taxation of settlement proceeds. A subsequent change in the law will not justify rescission of a settlement agreement or contract on the basis of "mistake of the law."

In *Sheet Metal Workers Local 137 v. Vic Const.*, 825 F. Supp. 463 (E.D. N.Y. 1993), the court addressed this issue. In *Vic Const.*, the parties orally entered into a settlement agreement arising from a suit brought over the failure of the defendant to make payments to the Union's Insurance, Annuity, and Apprenticeship Training Funds in violation of a collective bargaining agreement and § 515 of the Employee Retirement Income Security Act of 1974 (ERISA). The settlement agreement stipulated that the debts owed to the plaintiff were owed by Vic Construction Company but that Charles Nalbone, the sole corporate officer, would be personally liable for payment. Vic Construction refused to sign the memorialized settlement agreement, citing to a Second Circuit court opinion which had been released after the oral agreement had been entered into which held that individuals could not be liable for corporate ERISA obligations solely by virtue of their role as the only officer, director, and shareholder. Vic Construction argued that the agreement should be rescinded based on mutual mistake of the law because the oral agreement was entered into based on

law which was subsequently reversed. The federal district court disagreed, stating:

"Under limited circumstances a court may decline to enforce a contract due to a unilateral or mutual mistake at the time of the agreement. While some courts have declined to apply the doctrine when the mistake was one of law rather than fact, 'the modern view is that the existing law is part of the state of facts at the time of the agreement.' [Citations omitted.] But a 'poor prediction of events that are expected to occur' is not a mistake of fact. [Citation omitted.]

"The court declines to apply the doctrine of mistake in this instance. *This case involves not so much a mistake of settled law as a failure to determine or predict a controlling interpretation of a statute.*

"When negotiating an agreement, the attorneys representing the parties are expected to understand the relevant rights and obligations imposed by law. When deciding whether to accept a settlement offer, they must compare the benefit of a certain settlement with the risks and costs of continued litigation. *These risks include the chance that laws (including the judicial construction of statutes) may change.*

. . . .

"If parties can avoid contracts whenever courts clarify or change their interpretation of statutes, thereby altering material assumptions of the parties when accepting a settlement offer, every settlement would be susceptible to rescission due to facts entirely beyond the control of the settling parties. A central purpose of a settlement agreement—to eliminate all such risks while bringing finality to a dispute—would be undermined were courts to rescind agreements under such circumstances.

"This court sees no reason to decline to enforce the agreement simply because defendants' counsel relied upon a judicial opinion that was subsequently reversed." (Emphasis added.) 825 F. Supp. at 467-68.

In *Wilson v. New York City Transit Authority*, 115 Misc. 2d 1017, 454 N.Y.S.2d 962 (1982), the issue was resolved in the same manner as in *Vic Construction*. In *Wilson*, the parties had entered into a settlement agreement after the plaintiff had filed a personal injury suit against the defendant. In the settlement agreement the defendant agreed to pay the plaintiff $800 a month for lost earnings due to his injury even though a recent Court of Appeals opinion had held that a covered person could receive up to $1,000 a month in lost earnings from an insurance carrier. Subsequent to the settlement, the Court of Appeals held in another opinion that the $1,000 a month limit was retroactive in effect. The plaintiff there-

after demanded that the settlement be rescinded on the basis of a mutual mistake of the law. The *Wilson* court disagreed and stated:

"The Court holds that the agreement between the parties is binding and plaintiff cannot use a subsequent change in law to set aside a written agreement evidenced by the executed release. . . .

"In the instant case there has not been a mutual mistake of law. The Transit Authority was fully aware of the state of the law at the time it entered into settlement, as indicated earlier, it was this awareness which induced the Authority to settle the case. The Plaintiff's attorney was aware or should have been aware of the transient status of the law regarding payments. *Absent a specific provision in the release reserving plaintiff's right to pursue his action, the release represents the final agreement between the parties and plaintiff cannot now seek to relitigate the issue."* (Emphasis added.) 115 Misc. 2d at 1018-19.

Other courts have similarly held. See *Holland v. Virginia Lee Co., Inc.*, 188 F.R.D. 241, 251 (1999) (noting that a mutual mistake of the law is distinguishable from a subsequent change in the law and holding that the settlement agreement entered into by the parties would be not invalidated on the basis of a subsequent change in the law); *Anita Foundations v. ILGWU Nat. Retirement Fund*, 902 F.2d 185, 189-90 (2nd Cir. 1990) (holding that settlement was not subject to rescission under the doctrine of mistake of the law as settlements reached when the law is uncertain "cannot be successfully attacked on the basis of any subsequent resolution of the uncertainty"); and *New Jersey Mfrs. v. O'Connell*, 300 N.J. Super. 1, 7, 692 A.2d 51 (1997) (holding that settlement contract should not be disturbed by subsequent changes in the law as contracts are based on the law as it exists at the time of execution).

Indeed, this court has previously recognized that in order for a party to be successful in a claim of mutual mistake, the mistake must "be as to a past or present fact material to the contract and not a mere mistake in prophecy, opinion or in belief relative to an uncertain event . . . ." *McMillin v. Farmers & Bankers Life Ins. Co.*, 167 Kan. 502, 507, 206 P.2d 1061 (1949).

In the present case, there was no "mutual mistake of the law." There was no "mistake" at all. A mutual mistake of the law is distinguishable from a subsequent change in the law. The parties, at the time of the execution of the settlement agreement, were not mistaken as to the state of the law. They were, however, unable to

predict the subsequent decision by the Supreme Court in *Schleier* and the subsequent attempt by the IRS to collect taxes from the lump sum settlement payment. A subsequent change in the law or a subsequent court decision concerning the law will not support rescission of a previously made contract or settlement agreement. If parties were to use a subsequent change in the law as a basis for rescission of settlement agreements, the agreements would never represent a final resolution of the matter. Only when the parties are mutually mistaken about the law at the time the contract is executed will rescission be considered by the court. The trial court erred in holding otherwise. The trial court is reversed, and the case remanded to enter judgment for the appellants.

## II. CROSS-APPEAL

Krantz argues on cross-appeal that the district court erred when it ordered that the settlement money paid to him should be returned to the University and the Foundation. By virtue of our decision on the first issue, the cross-appeal is moot.

Reversed and remanded.