**SEARS, ROEBUCK AND COMPANY,**
Plaintiff,

v.

**SEARS REALTY COMPANY, INCORPO-RATED, d/b/a Sears Express Shoppe(s), Sears Oil Company, Incorporated, and Sears Petroleum and Transport Corporation, Defendant.**

No. 89–CV–1350.

United States District Court,
N.D. New York.

July 22, 1996.

Nims, Howes, Collison, Hansen & Lackert (William R. Hansen, of counsel), New York City, Greene, Hershdorfer & Sharpe (Bruce

G. Soden, of counsel), Syracuse, New York, for Plaintiff.

Bond, Schoeneck & King (Deborah H. Karalunas, of counsel), Syracuse, New York, Miles & Stockbridge (Vincent M. Amberly, of counsel), Washington, D.C., for Defendants.

## MEMORANDUM–DECISION AND ORDER

MUNSON, Senior District Judge.

Presently before the court is defendant's motion seeking enforcement of an alleged oral settlement agreement and dismissal of the instant complaint with prejudice. Plaintiff opposes defendant's motion and brings cross motions seeking summary judgment dismissing defendant's state common law damages claim, and Rule 11 sanctions against defendant for filing the instant motions.

## BACKGROUND

In the instant case, plaintiff Sears, Roebuck and Company ("Sears Roebuck") alleges five causes of action: 1) trademark infringement under § 32(1) of the Lanham Act, 15 U.S.C. § 1114(1); 2) unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a); 3) dilution of trademark under § 368–d of the New York General Business Law; 4) unfair competition under New York common law; and 5) declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. Complaint, Document ("Doc.") 1. The complaint was filed in response to defendant, Sears Realty Co., Inc., d/b/a Sears Express Shoppe(s), Sears Oil Co., Inc., and Sears Petroleum and Transport Corporation's ("Sears Oil"), planned expansion of its gasoline service station business in late 1988, as well as defendant's proposed move into the convenience store and credit card businesses. Defendant's answer includes several affirmative defenses and counterclaims. The first counterclaim requests declaratory relief under the federal Declaratory Judgment Act. The second counterclaim alleges state common law trademark infringement and unfair competition arising from plaintiff's use of the "SEARS" mark on

its oil products. By order dated December 4, 1990, the court granted a motion by plaintiff for a preliminary injunction prohibiting defendant from using the SEARS mark in connection with certain gas stations, convenience stores and credit card operations. Dec. 4, 1990 Memorandum–Decision and Order ("MDO"), Doc. 59 [1]. By order dated July 8, 1993, the court denied both parties' motions for summary judgment and continued the preliminary injunction. July 8, 1993 MDO, Doc. 79.

The present dispute arises out of the events surrounding a settlement conference. Defendant claims that the meeting resulted in a binding oral settlement agreement, and seeks enforcement of the alleged agreement. Defendant's ("Def.") Notice of Motion, Doc. 83. Plaintiff opposes the instant motion and cross moves for summary judgment of defendant's state law claim for damages. Plaintiff's Notice of Cross Motions, Doc. 83. In addition, plaintiff asks the court to sanction defendant for filing the instant motion. *Id.* A hearing was held on November 21, 22 and 30, 1994, at Syracuse, New York. The following constitutes the court's MDO with respect to defendant Sears Oil's motion to enforce the alleged settlement agreement, and with regard to plaintiff's cross motions for summary judgment and sanctions.

## FINDINGS OF FACT

Since plaintiff initiated the instant lawsuit on November 8, 1989, the parties have made substantial efforts to settle the case. At a pretrial conference in late November 1993, the parties agreed to a meeting of the principals to discuss a settlement, inasmuch as all previous negotiations handled by legal counsel were unsuccessful. The principals for Sears Roebuck and Sears Oil were James D. Thornton, Vice President–Automotive Division of Sears Roebuck, and Howard P. Sears, Jr., President of Sears Oil.

Prior to the meeting between the principals, counsel for both parties attempted to establish parameters for the meeting. Mr. Sears was particularly concerned that the principal for Sears Roebuck have the author-

---

**1.** The court assumes the reader's familiarity with the facts underlying plaintiff's claims and defen-

dant's counterclaims, set forth in the court's Dec. 4, 1990 MDO, Doc. 59, at 2–10.

ity to bind plaintiff to a contract. This was expressed in a letter from counsel for Sears Oil to counsel for Sears Roebuck: "Howard Sears would like to meet with the appropriate business person or persons at Sears Roebuck & Co. to discuss a settlement, businessman to businessman. Our only requirement is that the individual(s) who meets with Mr. Sears be qualified to settle this matter on behalf of your client." Dec. 1, 1993 Letter, Def.'s Exh. 1. Counsel for Sears Roebuck, William R. Hansen, gave assurances that Mr. Thornton had authority to bind his company to a settlement. Dec. 15, 1993 Letter, Def.'s Exh. 3 ("Mr. Thornton is an officer of Sears, Roebuck and Co. and has authority to speak for the corporation."); Dec. 21, 1993 Letter, Def.'s Exh. 4 ("As I confirmed to you on the telephone, Mr. Thornton is an officer of Sears, Roebuck and Co. and has the authority to obligate the corporation to a contract such as a settlement of the litigation.").

However, the parties appeared equally concerned with preserving the right not to be bound as a result of a meeting of the principals. Def.'s Exhs. 1–4. For example, in a letter to counsel for Sears Oil, Mr. Hansen expressly referred to the upcoming meeting as being held "off-the-record" and "completely without prejudice to the position of any of the parties to the litigation." Def.'s Exh. 3. In another letter, Mr. Hansen gave his assurance that Mr. Thornton had authority to bind Sears Roebuck, but qualified that statement with the following: "However, as I told you, this letter is not to be construed as an undertaking that Mr. Thornton will exercise his authority to so bind the corporation at the time of the meeting or at any time thereafter." Def.'s Exh. 4. Indeed, in a letter to Mr. Hansen, Vincent M. Amberly, counsel for Sears Oil, acknowledged the "without prejudice" status of the upcoming meeting of the principals. Def.'s Exhs. 1.

The court finds particularly instructive Mr. Thornton's understanding of the purpose of the principal's only meeting. As part of his duties as an officer for Sears Roebuck, Mr. Thornton regularly conducts contract negotiations. It is a Sears Roebuck policy that all contracts must be in writing, and any documents of a legal nature are subject to prior review by counsel. At the time of the principals-only meeting, Mr. Thornton knew that he had the authority to bind his company to a settlement. He first became aware of the instant lawsuit only about one month before the meeting with Mr. Sears and had no prior involvement in the course of settlement negotiations. Mr. Thornton was told by in-house counsel that the meeting was to be a "discussion without prejudice, off the record, as an attempt to try to resolve it with non-lawyers." Thornton Tr., Doc. 117, at 9. Based on his conversation with in-house counsel, Mr. Thornton believed that anything said during the meeting was not to have any binding effect on Sears Roebuck. While it was Mr. Thornton's intention to attend the meeting to listen to Mr. Sears' views as to how the matter could be resolved without a trial, he did not know that Mr. Sears intended to reach a settlement agreement at their meeting.

After a brief introduction of the parties at the meeting of the principals on January 5, 1994, the attorneys were dismissed from the room and Messrs. Sears and Thornton privately met for several hours. The meeting began with a general discussion in which Mr. Sears described the history of Sears Oil. He then expressed frustration with the course of the present litigation and accused the attorneys of being "obstructionists". Thornton Tr., Doc. 117, at 11–12; Thornton Tr., Doc. 107, at 27. During this portion of the discussion, Mr. Thornton said that in the "normal course of doing business, all documents of that nature or any legal contract would be reviewed by counsel." Thornton Tr., Doc. 107, at 27–31; Sears Tr., Doc. 110, at 105. Mr. Thornton did not explicitly state, however, that any settlement agreement reached during this particular meeting was subject to attorney review. Thornton Tr., Doc. 107, at 27–31.

The parties then discussed the territory in which Sears Oil sold automotive fuels, operated car washes and offered to consumers the use of a Sears Oil credit card under the SEARS mark. Sears Tr., Doc. 110, at 29–30. Mr. Thornton expressed his concerns with the territorial expansion of Sears Oil's operations. Mr. Sears produced a map that

showed the territory into which Sears Oil wished to expand its services. It was at this early stage of the meeting that Mr. Thornton said that he first wanted to have market research conducted and to speak with local Sears Roebuck managers. Mr. Thornton explained to Mr. Sears that it was the normal course of business at Sears Roebuck to conduct market research to measure consumer reaction, and that he heavily relied upon such research. Thornton Tr., Doc. 108, at 28, 31, 34, 36. The parties then discussed a market survey that had been conducted by Sears Roebuck earlier on in the instant lawsuit. Mr. Sears noted that the prior survey was not favorably viewed by the court, Thornton Tr., Doc. 108, at 28, and that he did not place much value in such surveys. *Id.* at 36. Mr. Thornton reiterated his desire to first conduct and review a new survey, and said that he needed to speak with Sears Roebuck managers in the Syracuse area. Thornton Tr., Doc. 117, at 12.

It is undisputed that the parties agreed that the territory into which Sears Oil may expand its operations would not extend into the states of Massachusetts or Vermont, or into downstate New York. Thornton Tr., Doc. 107, at 2–3; Sears Tr., Doc. 110, at 28–30. With regard to the remaining territory relative to the instant dispute, Mr. Thornton agreed to consider defendant's sale of gasoline and automotive fuels. (Def's Exh. 5). Thornton Tr., Doc. 107, at 8; Thornton Tr., Doc. 108, at 31. The conversation shifted to a more detailed discussion about the services offered by Sears Oil. Those services included, for example, the operation of gasoline stations, convenience stores and car washes, the use of credit card services, the sale of promotional products bearing the SEARS mark, and the sale of automotive fuels, including motor oil, transmission fluid and fuel oil. Sears Tr., Doc. 110, at 35–47. Included in the discussion pertaining to territorial expansion, the parties covered various other topics, such as whether Sears Oil could sell shocks, struts and car batteries. In addition, they discussed whether Sears Oil could offer a quick oil change service to customers, whether the convenience stores could sell the existing stock of metal utility cans bearing the SEARS mark, and the use of the mark on marine vessels and convenience store and gas station signs.

At the conclusion of the principals-only meeting, counsel for both parties were called into the room. Messrs. Sears and Thornton give divergent accounts of what was said in the presence of the attorneys. It is undisputed that Mr. Thornton was the first to address the group. Mr. Sears recalled that Mr. Thornton began the conversation by saying "not only do we have an agreement, not only do we have a settlement, we have Howard Sears back as a good customer." Sears Tr., Doc. 110, at 51. Mr. Thornton then recited the "points of [the] agreement." *Id.* Mr. Thornton does not recall the words "settlement" or "agreement" in describing the meeting. Instead, Mr. Thornton, reading from the notes that he had taken during the meeting, "announc[ing] the points that [they] had discussed." Thornton Tr., Doc. 107, at 34, 38. Mr. Thornton did say something to the effect that Sears Roebuck had Mr. Sears back as a good customer, but he did not intend to indicate by the remark that it was a result of a settlement agreement. Instead, Mr. Thornton was referring to Mr. Sears' comment that he had stopped using his Sears Roebuck credit card because of the instant lawsuit. Thornton Tr., Doc. 108, at 28. At some point during their private meeting, Mr. Sears had referred to his "willingness maybe to consider using the Sears credit card again." Thornton Tr., Doc. 117, at 16.

After Mr. Thornton addressed the group, Mr. Hansen, counsel for Sears Roebuck, remarked that the agreement was subject to attorney approval. Mr. Sears became upset and reiterated his objection to attorney involvement in the matter. Thornton Tr., Doc. 107, at 31. Mr. Amberly, counsel for Sears Oil, took notes while Mr. Thornton spoke to the attorneys and was chosen to draft a document about what had been discussed. Although Mr. Sears believed that the purpose of the document was to memorialize the terms of an oral settlement agreement, Sears Tr., Doc. 110, at 50–51, Mr. Thornton believed that it only was meant to "capture" what had been discussed during the meeting, Thornton Tr., Doc. 107, at 33–34. Stated another way, Mr. Thornton did not believe

that he and Mr. Sears had reached an agreement. Thornton Tr., Doc. 107, at 35.

In the weeks following the meeting, the parties engaged in certain activities that have a limited bearing on the issues presently before the court. On the day after the meeting, Mr. Sears sent a letter to Mr. Thornton stating in part:

> I believe the inclusive settlement of the various aspects of this entire matter as agreed upon by and between us is a fair and equitable conclusion to an otherwise litigious future. Our respective counsel now have the task to embody the substance and intent of our agreement in an appropriate memorialization. I am confident that we can direct that process so as to effectuate a speedy conclusion.

Def.'s Exh. 8. The letter, which Mr. Thornton has no recollection of receiving, Thornton Tr., Doc. 107, at 44, does not accurately reflect Mr. Thornton's belief as to what occurred at the meeting. *Id.* at 43–44. About one week after the meeting, Mr. Amberly sent a "draft Settlement Agreement" to Mr. Hansen. Agreement, attached to Jan. 12, 1994 Letter, Plaintiff's Exh. H. In July 1994, Mr. Hansen countered with a "draft settlement proposal" of his own. Agreement, attached to July 6, 1994 Letter, Plaintiff's Exh. L.

Mr. Thornton had several telephone conversations with Mr. Sears subsequent to their January meeting. During one of those conversations, Mr. Thornton stated that local Sears Roebuck managers had expressed concern about the expansion of Sears Oil operations, and with the likelihood of consumer confusion. Mr. Thornton also told Mr. Sears that he requested market research, and that Mr. Thornton was not able to "respond to the proposed agreement" until he had a chance to review the survey. Sometime after the principals-only meeting, and before about February 15, 1994, a market research survey was ordered by plaintiff's legal counsel. Thornton Tr., Doc. 117, at 74. In addition to the above events, the parties had additional conversations and exchanged several other letters in which they discussed the drafting of a settlement agreement. Plaintiff's Exhs. I, J, K, and M. Negotiations ultimately broke down sometime in the summer of 1994, and defendant subsequently filed the instant motion to enforce the putative oral settlement agreement.

## CONCLUSIONS OF LAW

### I. Settlement Agreement

#### A. Choice of Law

The issue presently before the court is whether the parties formed a valid oral agreement to settle a trademark dispute, and if so, whether the agreement is enforceable. Plaintiff argues that the court should apply state statutory law, Plaintiff's Mem. in Opposition, Doc. 88, at 7–8, Plaintiff's Post–Hearing Mem. in Opposition, Doc. 115, at 9–11, while defendant maintains that federal common law applies. Def.'s Mem. of Law, Doc. 98, at 7, 8, n. 3, Def.'s Mem. of Law, Doc. 84, at 13. As to what federal common law the court should apply, defendant argues that federal courts have consistently applied New York common law of contracts. Def.'s Mem. of Law, Doc. 98, at 10; Def.'s Mem. of Law, Doc. 84, at 17. If federal law must be applied, the court also must decide whether there exists an applicable federal rule. In the absence of a federal rule governing settlement agreements, the court must fashion a federal rule. In so doing, it may borrow state law or fashion a rule out of some other cloth. If state law applies, then the court must decide which substantive state rule to apply. *See United States v. Kimbell Foods, Inc.,* 440 U.S. 715, 727–29, 99 S.Ct. 1448, 1458–59, 59 L.Ed.2d 711 (1979); *see also* Erwin Chemerinsky, FEDERAL JURISDICTION, § 6.2.1. The court turns to a discussion of whether to apply federal or state law.

#### 1. Whether to Apply Federal Common Law

The court is unable to locate, and the parties have not pointed out, any provision within the Lanham Act that governs settlement agreements. Furthermore, the court has not identified any federal common law on point. As to the use of a federal common law rule, neither the Supreme Court, nor any Circuit Court of Appeals, including the Second Circuit, has articulated a rule with re-

spect to the enforceability of settlement agreements under the Lanham Act. As the discussion immediately below makes clear, the case law cited by defendant fails to adequately support the position that federal law supplies the rule of decision with respect to the settlement of a Lanham Act claim.

Defendant cites to numerous cases in support of the argument that the court should apply a federal rule of decision. Def.'s Mem. of Law, Doc. 98, at 3–10 (citing, *inter alia, Taylor v. Gordon Flesch Co., Inc.,* 793 F.2d 858 (7th Cir.1986); *Glass v. Rock Island Refining Corp.,* 788 F.2d 450 (7th Cir. 1986); *Mid–South Towing Co. v. Har–Win, Inc.,* 733 F.2d 386 (5th Cir.1984); *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir.1981); *Allen v. Alabama Bd. of Educ.,* 612 F.Supp. 1046 (M.D.Ala.1985); *Bergstrom v. Sears Roebuck & Co.,* 532 F.Supp. 923 (D.Minn.1982); *Gamewell Mfg., Inc. v. HVAC Supply, Inc.,* 715 F.2d 112 (4th Cir.1983); *Bd. of Trustees of the Sheet Metal Workers Local Union No. 137 Ins. Annuity and Apprenticeship Training Funds v. Vic Construction Corp.,* 825 F.Supp. 463 (E.D.N.Y.1993)). While these cases provide some guidance with regard to the issue presently before the court, they are not dispositive. For example, *Taylor, Glass* and *Fulgence* each hold that oral settlements of Title VII claims are enforceable under federal law. *Taylor,* 793 F.2d at 862; *Glass,* 788 F.2d at 454–55; *Fulgence,* 662 F.2d at 1209. *Taylor* and *Glass* cite to *Lyles v. Commercial Lovelace Motor Freight, Inc.,* 684 F.2d 501 (7th Cir.1982), which in turn cites to the Fifth Circuit's decision in *Fulgence* to support the claim that oral settlement agreements of Title VII claims are enforceable. In *Fulgence,* the Court specifically held that "federal law determines the validity of oral settlement agreements in employment discrimination actions brought pursuant to Title VII." *Fulgence,* 662 F.2d at 1209. The Court reasoned that the application of state law would interfere with a significant federal interest. In particular, the *Fulgence* Court observed that "Congress has mandated a policy of encouraging voluntary settlement of Title VII claims." *Fulgence,* 662 F.2d at 1209 (citing 42 U.S.C. § 2000e–5(b)). Sec-

ondly, the *Fulgence* Court declined to apply state law because "the Supreme Court has already established prerequisites to the validity of settlement agreements in Title VII suits." *Fulgence,* 662 F.2d at 1209 (citations omitted). Neither of these considerations are present in the case at bar. As far as this court is able to discern Congress has not expressed a particular interest in encouraging settlement agreements of Lanham Act claims. Nor has the Supreme Court articulated prerequisites to the validity of settlement agreements in Lanham Act claims, as it did with settlement agreements in Title VII suits. *See Alexander v. Gardner–Denver Co.,* 415 U.S. 36, 52 n. 15, 94 S.Ct. 1011, 1021 n. 15, 39 L.Ed.2d 147 (1974) (employee must knowingly and voluntarily consent to settlement agreement).

In *Allen v. Alabama Bd. of Educ.,* 612 F.Supp. 1046 (M.D.Ala.1985), another case cited by defendant, the Court relied heavily upon *Fulgence* for the claim that the validity of settlement agreements are determined by federal rather than state law. *Allen,* 612 F.Supp. at 1053. *Allen* is not helpful because it relies primarily on the Fifth Circuit's decision in *Fulgence,* a case that this court already distinguished. Furthermore, *Allen* involved a class action civil rights lawsuit against state officials alleging discrimination. As discussed below, while federal common law has been applied to disputes in which the United States is a party, the Supreme Court has declined to adopt federal common law for *private* disputes. *Morgan v. S. Bend Comm. School Corp.,* 797 F.2d 471, 475 (7th Cir. 1986).

In asserting that the court is bound to apply federal common law, defendant makes the claim that the Lanham Act, not state law, is the source of "the parties [sic] rights and liabilities under the settlement." Def.'s Mem. of Law, Doc. 98, at 7. Plaintiff counters that the settlement agreement itself is the source of the right. Addressing defendant's argument, the court notes that while federal law is one source of the parties' rights and liabilities as well as the source of this court's jurisdiction, it is not the sole source. Plaintiff brought the instant suit under state law as well as federal law. Fur-

thermore, defendant places too much emphasis on the court's jurisdictional bases over the instant claims. Def.'s Mem. of Law, Doc. 98, at 5. Although Congress granted federal courts original jurisdiction over all actions arising under the Lanham Act pursuant to 28 U.S.C. § 1338(a), that statute is merely jurisdictional and does not create any substantive legal rights. *Texas Indus., Inc. v. Radcliff Materials*, 451 U.S. 630, 640, 101 S.Ct. 2061, 2067, 68 L.Ed.2d 500 (1981) ("The vesting of jurisdiction in the federal courts does not in and of itself give rise to authority to formulate federal common law.") (citing *United States v. Little Lake Misere Land Co.*, 412 U.S. 580, 591, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973)); J. Thos. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, 3d ed. (1995), § 32.02 (citing *Water Technologies Corp. v. Calco, Ltd.*, 850 F.2d 660 (Fed.Cir.1988) ("Section 1338(b) is a jurisdictional statute, giving the district court jurisdiction to hear certain state or federal unfair competition claims. That statute does not create the substantive right underlying the claim.")). Furthermore, as discussed more fully below, the mere presence of federal law as a source of the parties' rights and liabilities does not, in itself, mandate the application of federal law. Based on the foregoing, the court concludes that there is no federal common law rule that determines the validity of oral settlement agreements under the Lanham Act.

In the absence of a federal rule of decision, the issue is whether the court should *create* a federal common law rule. Congress expressed a preference for federal courts to apply state rules in the Rules of Decision Act. That statute provides that "[t]he laws of the several states, except where the Constitution or treaties of the United States or Acts of Congress otherwise require or provide, shall be regarded as rules of decision in civil actions in the courts of the United States, in cases where they apply." 28 U.S.C. § 1652. The Supreme Court has repeatedly reaffirmed its allegiance to the principal that there is "no federal general common law." *See e.g., O'Melveny & Myers v. Federal Deposit Insurance Corp.*, 512 U.S. 79, ――, 114 S.Ct. 2048, 2053, 129 L.Ed.2d 67 (1994), citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *cf. Water Technologies*, 850 F.2d at 670 ("there is no federal common law of unfair competition"). There are, however, several instances in which federal courts have fashioned federal common law.

First, courts have done so in matters in which a federal rule of decision is necessary to protect uniquely federal interests. *Texas Indus., Inc.*, 451 U.S. at 640, 101 S.Ct. at 2067 (citations omitted) (adopting state law as rule of decision in determining effect of settlement in antitrust action). However, the Supreme Court emphasized that such instances are "few" in number and "limited to situations where there is a 'significant conflict between some federal policy or interest and the use of state law.'" *O'Melveny & Myers*, 512 U.S. at ――, 114 S.Ct. at 2055 (1994). Writing for a majority of the Court in *O'Melveny*, Justice Scalia noted that the very existence of a significant conflict is a "precondition for recognition of a federal rule of decision." *O'Melveny*, 512 U.S. at ――, 114 S.Ct. at 2055. In the case at bar, defendants have not pointed to any conflict, significant or otherwise, between a federal policy and the application of state law. Nor is the court able to identify any conflict that would arise from the application of state law and the Lanham Act that would frustrate the purposes of the federal statutory scheme.

Some courts have fashioned a federal rule when there is a perceived need for "uniformity" amongst the states. *Kimbell Foods, Inc.*, 440 U.S. at 728, 99 S.Ct. at 1458; *Kamen v. Kemper Financial Services, Inc.*, 500 U.S. 90, 98, 111 S.Ct. 1711, 1717, 114 L.Ed.2d 152 (1991). The Supreme Court has repeatedly recognized that "federal programs that 'by their nature are and must be uniform in character throughout the Nation' necessitate formulation of controlling federal rules." *Kimbell Foods, Inc.*, 440 U.S. at 728, 99 S.Ct. at 1458 (citations omitted). The need for uniform rules exists, for example, if Congress provides federal courts with exclusive jurisdiction. One such instance is the provision for exclusive federal court jurisdiction over ERISA claims. *See Sheet Metal Workers Local 137 v. Vic Construction*, 825 F.Supp. 463, 465–66 (E.D.N.Y.1993) ("[F]ederal com-

mon law should govern the validity of settlement agreements resolving ERISA disputes" because, *inter alia,* Congress provided for exclusive federal court jurisdiction over such disputes, "thereby encouraging the uniform development of federal common law principles."). Likewise, Congress provided exclusive jurisdiction with regard to patent and copyright claims. 28 U.S.C. § 1338(a). In contrast, Congress did not provide exclusive jurisdiction to federal courts to hear claims brought under the Lanham Act; state courts have concurrent jurisdiction to hear Lanham Act claims. *See, e.g., Berlitz Schools of Languages of America, Inc. v. Everest House,* 619 F.2d 211 (2d Cir.1980); *see also,* 4 J. Thos. McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION, § 32.01 (3d ed. 1994) ("[A] plaintiff wishing to file suit for violation of a provision of the Lanham Act has a choice to sue on the claim in either federal or state court."). *See e.g.,* Lanham Act § 34, codified at 15 U.S.C. § 1116 ("The several courts vested with jurisdiction of civil actions arising under this chapter shall have power to grant injunctions ... to prevent the violation of any right of the registrant of a mark registered in the Patent and Trademark Office.").

Courts have also found the need for a uniform national rule when federal law preempts a state law in a particular area through a comprehensive statutory scheme. For example, Congress expressly reserved the regulation of employee benefit plans to federal authority under ERISA, which expressly preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. section 1144(a); *see also Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990) (preemption clause is "conspicuous for its breadth" and its "deliberately expansive language was designed to establish pension plan regulation as exclusively a federal concern." (internal citations omitted)). Furthermore, the Supreme Court and the Second Circuit have acknowledged that federal courts are competent to fashion common law in claims brought under ERISA. *Chemung Canal Trust Co. v. Sovran Bank/Maryland,* 939 F.2d 12, 16 (2d Cir.), (quoting *Firestone Tire & Rubber Co.*

*v. Bruch,* 489 U.S. 101, 110, 109 S.Ct. 948, 954, 103 L.Ed.2d 80 (1989)).

Congress has not preempted the area of common law trademark. *See Mead Data Central v. Toyota Motor Sales, U.S.A.,* 702 F.Supp. 1031, 1040–41 (S.D.N.Y.1988) ("To the extent that the New York [antidilution statute, N.Y.Gen.Bus.Law § 368–d,] protects rights not provided for by the federal statute, it does not conflict with the Lanham Act but rather, it complements and supplements it."), *rev'd on other grounds,* 875 F.2d 1026 (2d Cir.1989); *see also Nikon, Inc. v. Ikon Corp.,* 803 F.Supp. 910, 925–26 (S.D.N.Y.1992) (citing *Mead Data Central,* 702 F.Supp. 1031 (S.D.N.Y.1988)); *La Chemise Lacoste v. Alligator Co.,* 506 F.2d 339, (3d Cir.1974), *cert. denied,* 421 U.S. 937, 95 S.Ct. 1666, 44 L.Ed.2d 94, *reh. denied,* 421 U.S. 1006, 95 S.Ct. 2408, 44 L.Ed.2d 674 (1975). Although the Lanham Act would preempt *conflicting* state trademark law, it does not do so when state trademark law *expands* the rights provided under the federal statute. *LeSportsac, Inc. v. K Mart Corp.,* 617 F.Supp. 316, 318 (E.D.N.Y.1985).

Another reason for developing a uniform national rule is the federal interest in remedying unequal bargaining power, such as in claims under Title VII, the Truth in Lending Act, The Age Discrimination In Employment Act, The Federal Employer's Liability Act, and the Jones Act. *Gamewell,* 715 F.2d at 114–15, and cases cited therein. In the case at bar, there is no need to develop a uniform rule inasmuch as the parties are of relatively equal bargaining power.

The Supreme Court also has declined to adopt federal common law for purely private disputes, even ones that potentially affect federal interests. *Morgan,* 797 F.2d at 475. On the other hand, federal common law has been fashioned when the United States is a party. *See Morgan,* 797 F.2d at 475 (citing *Clearfield Trust Co. v. United States,* 318 U.S. 363, 63 S.Ct. 573, 87 L.Ed. 838 (1943); *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 93 S.Ct. 2389, 37 L.Ed.2d 187 (1973)). Because the United States is not a party to the instant lawsuit, there is no basis under this rationale for applying feder-

al common law. Furthermore, even in instances in which the United States is a party, or in which the operation of a federal program is affected, a court usually should apply state law. *Morgan,* 797 F.2d at 475 (citing *Kimbell Foods, Inc.,* 440 U.S. at 728–29, 99 S.Ct. at 1458–59).

Yet another basis upon which courts have justified fashioning a federal rule is pursuant to express Congressional approval. "Federal common law also may come into play when Congress has vested jurisdiction in the federal courts and empowered them to create governing rules of law." *Texas Indus., Inc.,* 451 U.S. at 643, 101 S.Ct. at 2068 (citing *United States v. Little Lake Misere Land Co.,* 412 U.S. 580, 591, 93 S.Ct. 2389, 2396, 37 L.Ed.2d 187 (1973) (holding that Congress did not confer power on federal courts to formulate the right to contribution in antitrust claims). However, with regard to the instant case, the court is unable to find, and defendant has not pointed to any express Congressional authorization under the Lanham Act to justify creating a rule to determine the validity of a settlement agreement.

The court concludes that state law must be applied to determine the validity of a settlement agreement under the Lanham Act because there is no federal statute or common law rule on point that provides a rule of decision, and because the circumstances do not justify the creation of a federal common law rule.

### 2. Application of State Law

#### a) *Which Rule to Apply*

Having concluded that state law must be applied to determine whether the parties reached an enforceable settlement agreement, the court must now decide which state rule of decision to apply. In arguing for the application of "federal common law," defendant cites to cases in which courts faced with a similar issue applied state common law. Def.'s Mem. of Law, Doc. 98, at 10–17; Def.'s Mem. of Law, Doc. 84, at 17. In contrast, plaintiff advocates the application of New York Civil Practice Law and Rules § 2104, which provides that a settlement agreement made outside the presence of the court, and which purports to dispose of a lawsuit, must be evidenced by a signed writing. Specifically, § 2104 provides that

> An agreement between parties or their attorneys relating to any matter in an action, other than one made between counsel in open court, is not binding upon a party unless it is in writing subscribed by him or his attorney or reduced to the form of an order and entered.

N.Y.Civ.Prac.L. & R. § 2104 (McKinney 1976). Plaintiff also asks the court to deny the instant motion to enforce a settlement agreement because such an agreement would violate what is commonly referred to as the New York State statute of frauds. That statute states in relevant part, that

> [e]very agreement, promise or undertaking is void, unless it or some note or memorandum thereof be in writing, and subscribed by the party to be charged therewith, or by his lawful agent, if such agreement, promise or undertaking ... [b]y its terms is not to be performed within one year from the making thereof.

N.Y.Gen.Oblig.Law § 5–701(a) (McKinney 1989) ("§ 5–701"). Although courts commonly refer to § 5–701 as the New York statute of frauds, § 2104 also is a statute of frauds, at least in effect, because it requires a signed writing for an agreement to be enforceable. *See* 61 New York Jurisprudence 2d, Statute of Frauds § 2.

■ The court notes that both parties seem to confuse the issue of contract formation with that of contract enforceability. With regard to the alleged settlement agreement, the court must ask whether the parties actually formed an agreement. As discussed below, it is appropriate for the court to apply state common law principles to the issue of contract formation, in general. If an agreement was reached, the court then must decide whether the agreement is enforceable. In other words, the court must decide whether there exists a defense, such as the statute of frauds, that would preclude the court from enforcing a validly formed contract. For reasons set forth below, the court concludes that state common law governs questions regarding the *formation* of contracts. The *enforceability* of a valid contract, on the oth-

er hand, is governed by the statute of frauds. A brief discussion of the case law cited by the parties is in order.

None of the cases cited by defendant require that the court apply state common law to the exclusion of § 2104. For instance, in *Winston v. Mediafare Entertainment Corp.,* 777 F.2d 78, 80 (2d Cir.1985), the plaintiff initiated a lawsuit alleging that the defendant breached a sales contract. During the course of litigation, plaintiff sought to enforce a settlement agreement allegedly reached during the course of settlement negotiations. *Winston,* 777 F.2d at 79–80. Applying "New York law," the court examined several factors to determine whether the parties *intended to form a contract. Id.* at 80. Interestingly, those factors are taken principally from the Second Circuit's prior opinion in *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 74 (2d Cir.1984). *R.G. Group,* however, did not involve a situation in which a party was attempting to enforce an alleged settlement agreement reached during the course of litigation. Unlike the situation in *Winston* or the case at bar, the situation in *R.G. Group* involved an alleged oral contract that arose during the course of contract formation, and not during the course of settlement of a lawsuit. *R.G. Group,* 751 F.2d at 71–74. *Compare V'Soske v. Barwick,* 404 F.2d 495, 499 (2d Cir.1968), *cert. denied,* 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969) (lawsuit to enforce contract allegedly reached outside course of litigation). The *R.G. Group* Court applied New York common law of contracts to determine whether the parties intended to be bound by an oral contract. In addition, after concluding that no oral contract had been formed, the *R.G. Group* Court appropriately went on to apply the § 5–701 statute of frauds to determine whether the oral agreement was enforceable.

*R.G. Group,* 751 F.2d at 77–78. The Court's decision in *R.G. Group* actually weighs in favor of this court applying both state common law and the statute of frauds.[2]

For similar reasons, a number of other cases cited by defendant fail to convince the court not to apply § 2104. For example, in *Grupo Sistemas v. AT & T Communications, Inc.,* No. 92 Civ. 7862, 1994 WL 463014 (S.D.N.Y. Aug. 24, 1994), a common law breach of contract cause of action, the district court declined to apply § 2104 and concluded instead that "New York's substantive law of contracts, governs the question of the enforceability of an oral settlement agreement in federal court." *Id.* at *6, n. 1. The court, without any discussion, based its decision not to apply § 2104 primarily upon the Second Circuit's decisions in *Winston, R.G. Group,* and *Int'l Telemeter Corp. v. Teleprompter Corp.,* 592 F.2d 49 (1979). However, for the reasons previously stated, neither *Winston* nor *R.G. Group* preclude this court from applying § 2104. In *Int'l Telemeter,* the Second Circuit Court of Appeals affirmed the lower court's decision to enforce a settlement agreement reached by the parties during the course of a patent dispute. *Id.* at 57. In its decision, the Second Circuit applied New York common law pertaining to the formation of contracts, *id.* at 56–57, but did not even discuss the applicability of the statute of frauds defense.[3] The cases cited by defendant are sufficiently distinguishable from the case at bar and therefore do not preclude this court from applying § 2104. The court turns to a discussion of cases in which courts have applied § 2104 to resolve settlement disputes.

The New York Court of Appeals has consistently applied § 2104 to disputes involving oral settlement agreements. *See In re Dol-*

2. The *R.G. Group* Court did not mention § 2104, presumably because the statute only is applicable to settlement agreements reached during the course of litigation. In contrast, when the statute of frauds defense is raised with regard to an oral agreement reached during contract negotiations outside the course of litigation, as was the situation in *R.G. Group,* then § 5–701 would be the appropriate statute to apply. Lastly, the court notes that in *Winston,* the Second Circuit did not address the statute of frauds defense. If the *Winston* Court had considered a statute of

frauds defense, it would have been appropriate for that Court to apply § 2104 because the settlement agreement was allegedly reached between parties during the course of litigation.

3. The court presumably did not discuss whether to apply state or federal common law because the parties agreed that New York law governed the enforceability of the settlement agreement. *Int'l Telemeter Corp.,* 592 F.2d at 50.

*gin Eldert Corp.,* 31 N.Y.2d 1, 8, 334 N.Y.S.2d 833, 838–39, 286 N.E.2d 228 (1972), and cases cited therein (settlement agreements must comply with § 2104); *Klein v. Mount Sinai Hosp.,* 61 N.Y.2d 865, 474 N.Y.S.2d 462, 462 N.E.2d 1180 (1984) (same); *Hallock v. State of New York,* 64 N.Y.2d 224, 485 N.Y.S.2d 510, 474 N.E.2d 1178 (1984) (same). Lower state courts have followed suit. *See e.g., Greenidge v. City of New York,* 179 A.D.2d 386, 578 N.Y.S.2d 157 (1st Dep't 1992); *Raso v. Raso,* 129 A.D.2d 692, 514 N.Y.S.2d 516 (2d Dep't 1987); *Van Syckle v. Powers,* 106 A.D.2d 711, 483 N.Y.S.2d 756 (3rd Dep't 1984), and cases cited therein.

Additional support for applying § 2104 is found in several federal court decisions in this jurisdiction. Some courts have applied both state common law and the statute of frauds to determine the validity of settlement agreements. *Apple Corps. Ltd. v. Sony Music Entertainment, Inc.,* No. 91 Civ. 7465, 1993 WL 267362 (S.D.N.Y. July 14, 1993); *Villeroy & Boch S.a.r.l. v. THC Systems, Inc.,* No. 84 Civ. 8073, 1991 WL 102520 (S.D.N.Y.1991). In *Villeroy,* the court applied state common law and the § 5–701 statute of frauds, but never mentioned the § 2104 statute of frauds. In *Apple Corps. Ltd.,* by way of contrast, the court applied state common law and § 2104, without mentioning § 5–701, and concluded that the result was the same under both statutory and common law. *Apple Corps. Ltd.,* No. 91 Civ. 7465, 1993 WL 267362, at *5–6. These cases, both of which deal with the settlement agreements allegedly reached during the course of litigation, illustrate the confusion as to which statute to apply.

Other courts have relied exclusively on § 2104. In a well reasoned opinion, the district court in *In re Lady Madonna Indus. Inc.,* 76 B.R. 281, 290–91 (S.D.N.Y.1987), applied § 2104 to determine the validity of a bankruptcy settlement. *See also In re Stein & Day, Inc.,* 113 B.R. 157, 163 (Bankr. S.D.N.Y.1990) (citing *In re Lady Madonna,* 76 B.R. at 290) (§ 2104 must be applied to determine validity of bankruptcy settlement); *Wachovia Bank of Georgia v. Apex Tech of Georgia, Inc.,* 144 B.R. 649, 655 (S.D.N.Y. 1992) (same) (citing *In re Lady Madonna,* 76

B.R. at 290, and *In re Dolgin Eldert Corp.,* 31 N.Y.2d at 8, 334 N.Y.S.2d at 838–39). In *Randim Marketing, Inc. v. Professional Sports Merchandisers, Inc.,* 571 F.Supp. 1169 (S.D.N.Y.1983), the district court applied § 2104 in a garden variety breach of contract lawsuit. The court refused to enforce an alleged oral settlement agreement reached during the course of litigation because the agreement was not in writing or made in open court, as required by § 2104. *Id.* at 1170–71 (citing *Dolgin,* 31 N.Y.2d 1, 334 N.Y.S.2d 833, 286 N.E.2d 228 (1972) ("Since *Dolgin,* New York courts have required settlement agreements to be in writing under § 2104." (citations omitted)); cf. *Monaghan v. SZS 33 Associates, L.P.,* 875 F.Supp. 1037, 1042 (S.D.N.Y.1995) (acknowledging that § 2104 requires that settlement agreements be evidenced by a signed writing or be made in open court, except when the agreement is "definite and complete" and one of the parties acted in "good faith reliance" upon the existence of the agreement)). In *Murphy v. Gallagher,* 761 F.2d 878 (2d Cir. 1985), the Second Circuit Court of Appeals affirmed a lower court's order dismissing a securities fraud action on the basis that a prior state court action precluded federal litigation of identical issues. In its decision, the Second Circuit approved the trial court's refusal to enforce an alleged settlement stipulation because it failed to comply with § 2104. *Murphy,* 761 F.2d at 883–84 (citing *Dolgin,* 31 N.Y.2d 1, 9–10.).

■ Based on the foregoing, the court concludes that state common law must be applied to determine whether the parties formed an oral settlement agreement *and* state statutory law must be applied to determine whether the agreement, if any, is enforceable. The court also concludes that the § 2104 statute of frauds should be applied instead of § 5–701 because that statute directly governs oral *settlement* agreements. The court turns to a discussion of the issues of contract formation and contract enforceability seriatim.

### B. Application of State Law

### 1. Contract Formation

■ Whether the parties to the instant case actually formed an agreement, absent

an appropriate memorialization, depends upon what the parties' intended. In order to ascertain the parties' intent, "a court must look to 'the words and deeds [of the parties] which constitute objective signs in a given set of circumstances.'" *Winston,* 777 F.2d at 80. The Second Circuit has articulated four factors to assist in determining the parties' intent:

> (1) whether there has been an express reservation of the right not to be bound in the absence of a writing; (2) whether there has been partial performance of the contract; (3) whether all of the terms of the alleged contract have been agreed upon; and (4) whether the agreement at issue is the type of contract that is usually committed to writing.

*Winston,* 777 F.2d at 80 (citing *R.G. Group,* 751 F.2d at 74). The court discusses each of these factors in turn.

### 2. *Express Reservation of Intent Not to be Bound*

At least one party to the instant dispute clearly expressed an intention not to be bound absent a formal writing. Counsel for plaintiff stated in a letter to defendant that the meeting was to be held "off-the-record", and "completely without prejudice to the position of any of the parties to the litigation." Def.'s Exhs. 3 and 4. Even counsel for defendant expressly acknowledged the "without prejudice" status of the upcoming meeting between the principals. Def.'s Exh. 1. Furthermore, although Mr. Thornton did not explicitly tell Mr. Sears that he was reserving the right not to be bound prior to the execution of a formal document, Mr. Thornton told Mr. Sears that it was his practice to have counsel review any legal documents, and that he intended to meet with local Sears Roebuck managers and order additional market research. Thornton Tr., Doc. 107, at 27; Thornton Tr., Doc. 117, at 18; Thornton Tr., Doc. 108, at 28, 31, 34, 36.

The plain meaning of the language contained in the letters, as well as Mr. Thornton's statements, sufficiently conveyed plaintiff's reservation of the right not to be bound to an agreement absent the execution of a formalized document subscribed by both parties. Although the parties in the instant case were free to enter into a binding oral contract, the communication by either party of the intent not to be bound absent a fully executed document prevents the formation of an agreement. *See Winston,* 777 F.2d at 80. The policy behind this rule is to allow the parties to "negotiate candidly, secure in the knowledge that [they] will not be bound until execution of what both parties consider to be [the] final document." *Id.* at 80.

### 3. *Partial Performance*

"Partial performance is an unmistakable signal that one party believes there is a contract; and the party who accepts performance signals, by that act, that it also understands a contract to be in effect." *R.G. Group,* 751 F.2d at 75–76. The partial performance that defendant alleges that establishes the existence of a contract was the sale of defendant's existing stock of metal utility cans bearing the SEARS mark. Sears Tr., Doc. 110, at 47. However, as discussed more fully below, there is no evidence in the record that shows how many cans were involved, whether the stock was eventually sold, or how much revenue was at stake. Furthermore, as best the court can discern, the sale of utility cans is insignificant in the light of the subject matter of the negotiations taken as a whole. The court concludes that defendant's alleged partial performance in reliance on the existence of an oral agreement is insufficient to establish the existence of an agreement.

### 4. *Unresolved Negotiation Terms*

"A third factor is whether there was literally nothing left to negotiate or settle, so that all that remained to be done was to sign what had already been fully agreed to." *R.G. Group,* 751 F.2d at 76 (citations omitted). Mr. Thornton's intention to speak with local Sears Roebuck managers and to conduct further market research subsequent to the principals-only meeting is strong evidence that material terms of the agreement remained to be negotiated. In addition, Mr. Thornton never told Mr. Sears or anyone else that they had agreed to a resolution of any of the topics that were discussed during the meet-

ing, and conspicuously absent from any discussion during the meeting was the topic of defendant's counterclaims against plaintiff. The absence of any discussion of those counterclaims is significant in view of the relief defendant is seeking. In particular, had the parties discussed defendant's counterclaims, they would have had to discuss the sale of motor oil by Sears Roebuck in defendant's traditional market area. There is no evidence that the topic was discussed during the course of the principals-only meeting.

### 5. Written Agreement in the Normal Course of Business

The last factor that the court should consider in determining whether the parties actually intended to reach an oral settlement agreement is whether the agreement at issue is the type that typically would be reduced to a formal written contract. The alleged settlement agreement was substantially complex. It covered a wide variety of commercial activities, called for significant limitations on the geographic area in which those activities could be conducted, and in all likelihood affected a substantial amount of sales revenue for both parties. *See e.g.*, Plaintiff's Exh. H, and attachment; *compare Winston*, 777 F.2d at 83 (finding a four-page agreement requiring that $62,500 be paid over several years was sufficiently complex to require a written contract). As the Second Circuit has aptly observed, the freedom to conduct settlement negotiations without the risk of being bound to an oral agreement "is especially important when business entrepreneurs and corporations engage in substantial and complex dealings.... The actual drafting of a written instrument will frequently reveal points of disagreement, ambiguity, or omission which must be worked out prior to execution." *R.G. Group*, 751 F.2d at 75. In a related vein, when the parties are adversaries and the course of negotiations are protracted and contentious, as in the case at bar, "prudence strongly suggests that [the] agreement be written in order to make it readily enforceable, and to avoid still further litigation." *Winston*, 777 F.2d at 83.

In summary, each of the four factors tends to show that the parties did not intend to be bound to an oral agreement as a result of the discussion between the principals. The court holds therefore that the parties did not form a binding oral settlement agreement. Having determined that the parties did not reach an agreement, the court turns to a discussion of the statute of frauds defense raised by plaintiff.

### C. Statute of Frauds Defense

#### 1. CPLR § 2104

██ Even if the court concludes that the parties to the instant case reached an oral settlement agreement, the agreement is unenforceable because it violates the statute of frauds. The record presently before the court adequately demonstrates that the parties did not literally comply with § 2104 because the alleged settlement agreement is not evidenced by a writing signed by plaintiff, and no agreement was made by the attorneys in open court. CPLR § 2104 specifically requires that an agreement be in a "writing subscribed by [a party] or his attorney." Neither party disputes that the settlement negotiation process failed to produce a document signed by *both* parties embodying the terms of the agreement. In the absence of a single document evidencing an agreement, "[t]he required memorandum may consist of several documents only some of which are signed, provided that they clearly refer to the same transaction." *R.G. Group*, 751 F.2d at 77 (discussing § 5–701), and cases cited therein); *see also Morrison v. Bethlehem Steel Corp.*, 75 A.D.2d 1001, 429 N.Y.S.2d 123, 124 (4th Dep't 1980) (letters between attorneys explicitly acknowledged settlement); *Berne Investors, Inc. v. Wechsler*, 152 A.D.2d 804, 543 N.Y.S.2d 585, 587 (3rd Dep't 1989) ("it is well settled that a memorandum sufficient to satisfy the Statute of Frauds 'may be pieced together out of several writings, some signed and others unsigned, and parol evidence may be resorted to in aid thereof'" (citations omitted) (discussing § 5–701)); *cf. Golden Arrow Films, Inc. v. Standard Club of Calif., Inc.*, 38 A.D.2d 813, 328 N.Y.S.2d 901 (1st Dep't 1972) ("record made in written notes by the Justice in his chambers"). However, the writings must "completely evidence" the existence of

a contract, and if the writings show otherwise, then the statute of frauds precludes enforcement of the alleged agreement. *Id.* at 77–78 (citations omitted). *See also Royal Air Maroc v. Servair, Inc.*, 603 F.Supp. 836, 841 (S.D.N.Y.1985) ("Under New York law, an integration of several documents satisfies the writing requirement of the statute [of frauds] where they refer to the same subject matter, together contain all the material terms, and at least one of which is signed or prepared by the party to be charged." (citations omitted)).

In the case at bar, defendant urges the court to construe the notes written and allegedly "subscribed" by Mr. Thornton during the January 5, 1994 settlement meeting as a writing sufficient to satisfy the statute of frauds. Def.'s Post–Trial Mem. of Law, Doc. 116, at 24. Defendant maintains that plaintiff should not be allowed to assert a statute of frauds defense because Mr. Thornton "conveniently 'lost' " the notes. *Id.* It is difficult to consider Mr. Thornton's notes as an embodiment of the settlement agreement. First, there is almost no evidence as to what was contained in those notes. The lack of evidence as to the content of the notes prevents the court from concluding that they contain all the material terms of the alleged agreement. Furthermore, there is no indication that Mr. Thornton subscribed the notes, as defendant alleges, or any other document that sets forth the terms of the alleged agreement. Sears Tr., Doc. 110, at 91. Nor is the court convinced that the notes were intentionally "lost" by Mr. Thornton, as defendant intimates. The court therefore concludes that in the absence of a sufficient writing, the alleged settlement agreement violates the statute of frauds, § 2104, and is not enforceable against plaintiff. The court turns to a discussion of whether there exists an exception to the statute of frauds requirements.

2. *Promisory Estoppel*

■ The doctrine of promissory estoppel may preclude a party from asserting a statute of frauds defense. In order to prevail under the doctrine, a party must show 1) a clear and unambiguous promise, 2) fraudu-

lently made, 3) reasonable reliance upon the promise, 4) reliance that was unequivocally referable to the promise, and 5) that the party suffered substantial injury as a result of the reliance. *See Chromalloy American Corp. v. Universal Housing Systems*, 495 F.Supp. 544, 551 (S.D.N.Y.1980) (citations omitted); *Esquire Radio & Electronics v. Montgomery Ward*, 804 F.2d 787, 793 (2d Cir.1986) (citations omitted). The purpose of the doctrine is to "prevent the infliction of unconscionable injury and loss upon one who has relied on the promise of another." *American Bartenders School, Inc. v. Madison Co.*, 59 N.Y.2d 716, 463 N.Y.S.2d 424, 450 N.E.2d 230 (1983) (citing 3 Williston, Contracts, 3d ed., § 533A, at 798; *Imperator Realty Co. v. Tull*, 228 N.Y. 447, 453, 127 N.E. 263 (1920). The doctrine is applied, however, only in "rare and special cases." 61 New York Jurisprudence 2d, Statute of Frauds, § 297. As the Second Circuit Court of Appeals stated, "the doctrine of promissory estoppel is properly reserved for that limited class of cases where 'the circumstances are such as to render it unconscionable' to deny the promise upon which the [party] has relied." *Philo Smith & Co. v. USLIFE Corp.*, 554 F.2d 34, 36 (1977) (per curiam) (citation omitted).

■ In the case at bar, defendants have not satisfied the elements necessary to justify estopping plaintiff from asserting a statute of frauds defense. First, the evidence before the court does not show that any officer or representative of Sears Roebuck either made a clear and unambiguous promise, or intended to mislead any officer or representative of Sears Oil when the parties met to discuss a settlement. The claim that a clear and unambiguous promise was fraudulently made is belied by the written disclaimers of contractual liability. Plaintiff's Exh. P, Def.'s Exh. 1, 2, and 3. Defendant also makes much of the fact that Mr. Thornton did not expressly tell Mr. Sears that any settlement agreement reached during the meeting was subject to attorney review and approval. Def.'s Post–Trial Mem. of Law, Doc. 116, at 13. However, Mr. Thornton told Mr. Sears of the need for review of the matter by counsel, and of the need for further market research.

Furthermore, the draft settlement agreement prepared by defendant after the principals-only meeting contained language that, on its face, suggests that a binding agreement was conditioned on the signing by both parties of a final document. "The effective date of this agreement shall be the date on which the agreement has been fully executed by both parties." Def.'s Exh. 8, para. 18. Viewing the circumstances as a whole, the court is unable to conclude that plaintiff made a clear and unambiguous promise to defendant, or that defendant was misled by any officer or representative of Sears Roebuck.

More significant is defendant's failure to show that the decision to rely upon the putative agreement was reasonable in light of the circumstances, or produced substantial injury. The only reliance which the court can discern is the sale of defendant's existing stock of metal utility cans bearing the SEARS mark. Mr. Sears testified that due to recent developments in the retail market, his convenience stores "were overloaded with these ... cans" and that he wanted to sell the existing inventory without replacing the stock. Sears Tr., Doc. 110 at 47; Thornton Tr., Doc. 107, at 26. Apart from the testimony that the convenience stores were "overloaded" with utility cans, there is no evidence in the record as to how many cans were involved, or whether substantial revenue was derived from the sales of these items. Nor is it clear from the testimony that Mr. Sears agreed to forgo future sales of the utility cans once the existing stock was sold off. What is suggested by Mr. Sears' testimony is that the convenience stores owned by defendant had a large inventory of a product that was showing poor prospect for future sales, and that he wanted to sell the remaining inventory. Sears Tr., Doc. 110, at 47. The record lacks evidence that defendant would have continued to sell utility cans but for the lawsuit by plaintiff, and whether forgoing such sales constitutes a substantial loss to defendant. Furthermore, considered in context of the other items that were being discussed during the settlement meeting, the sale of the utility cans appears insignificant. In short, defendant has not established that it suffered substantial injury in reliance upon the alleged settlement agreement.

Nor is the court able to countenance defendant's argument that Sears Oil "gave up" certain rights sufficient to satisfy the reliance requirement. For example, defendant argues that it "gave up the right to sell batteries, tires, shocks, struts and other automobile front end repair parts under any name." Def.'s Post–Trial Mem. of Law, Doc. 116, at 11, n 16. However, at the time of the alleged agreement, Sears Oil was not in the business of selling such products, Sears Tr., Doc. 110, at 40, and it is unclear from the record that Sears Oil had any intention of entering the market with regard to those products, Thornton Tr., Doc. 107, at 38. Even if Sears Oil was contemplating selling those products through its convenience stores, it is purely speculative for the court, without more specific information, to make a determination as to whether foregoing the sales of those products at some unspecified date in the future constitutes substantial injury to defendant.

Because defendant cannot satisfy any exception to the statute of frauds, enforcement of the putative oral settlement agreement is barred. For all the foregoing reasons, the court denies defendant Sears Oil's motion to enforce the alleged oral settlement agreement, and to dismiss the instant cause of action. The court turns to address plaintiff's cross motions for sanctions and partial summary judgment.

## II. Rule 11 Sanctions

Plaintiff seeks sanctions under Rule 11 of the Federal Rules of Civil Procedure, alleging that defendant's instant motion is not objectively reasonable and that defendant failed to withdraw it after realizing that it was no longer tenable. Plaintiff specifically argues that defendant's motion to dismiss is not warranted under existing New York law, and further, that defendant fails to argue for the extension, modification, or reversal of existing law, or the establishment of new law. Plaintiff's Mem. in Support of Its Cross–Motion for Sanctions Under Rule 11 ("Plaintiff's Rule 11 Mem."), Doc. 93, at 8–12. Secondly, plaintiff argues that defendant's

motions are "not well grounded in fact." Plaintiff's Rule 11 Mem., Doc. 93, at 13.

■ The court first notes that the determination of whether conduct may be sanctioned is undertaken using the standard in effect at the time of the alleged conduct occurred. *Knipe v. Skinner*, 19 F.3d 72, 78 (2d Cir.1994). Because the conduct presently at issue occurred in 1994, the court will apply the current version of Rule 11, as amended in 1993.

The instant motion for sanctions must be denied because it does not comply with straightforward procedural requirements. Under the current version of Rule 11, a motion must be made *separately* from other motions and *served* on the opposing party, and shall not be *filed* with the court unless within 21 days after service of the motion, the challenged paper is not withdrawn or appropriately corrected. Fed.R.Civ.P. 11(c)(1)(A); *Hadges v. Yonkers Racing Corp.*, 48 F.3d 1320, 1327–28 (2d Cir.1995). Rule 11 was amended in 1993 to put "greater constraints on the imposition of sanctions" and was intended, in part, to "reduce the number of motions for sanctions presented to the court." Advisory Committee Note on 1993 Amendment. The 21–day period, commonly referred to as the Rule 11 "safe harbor" provision, allows a party an opportunity to withdraw or correct the challenged claim or contention. If the objectionable contention is corrected or withdrawn, then "the motion should not be filed with the court." Fed. R.Civ.P. 11(c)(1)(A); Advisory Committee Note on 1993 Amendment.

■ Plaintiff's Rule 11 motion does not comply with these straightforward procedural requirements. First, plaintiff did not make a separate Rule 11 motion but instead combined it with several other motions. Plaintiff's Notice of Cross Motions, Doc. 92[4]. Second, and more importantly, plaintiff failed to serve the Rule 11 motion upon defendant 21 days *before filing* that motion with the court. Plaintiff served a copy of its Rule 11 motion on October 14, 1994, the same day that the motion was filed with the court. Affid. of Service by Mail, Doc. 96. With an extension of time to respond granted by the court, defendant filed its response to plaintiff's Rule 11 motion on November 4, 1994.

Without expressly mentioning the 21–day filing requirement of Rule 11, plaintiff appears to argue that the "safe harbor" provision was satisfied because defendant was "offered" on two occasions the opportunity to withdraw their motion. Plaintiff's Rule 11 Mem., Doc. 93, at 7. By letter to counsel for defendant Sears Oil, dated September 6, 1994, plaintiff's counsel argued at great length that the events during the course of settlement negotiations did not support defendant's position that an agreement was reached by both parties. In that letter, counsel requested defendant not to proceed with the motion to enforce an alleged settlement agreement. During a meeting before the court on September 15, 1994, counsel for plaintiff asked defendant to withdraw the motion. Plaintiff's Rule 11 Mem., Doc. 93, at 5. There is no mention however, in either the minutes of the pretrial conference, Minute Entry, Doc. 87, or in the September 6, 1994 letter, that plaintiff would seek sanctions under Rule 11 if defendant refused to withdraw their motion. Neither the letter nor the oral request to withdraw the motion constitute sufficient notice to defendants within the meaning of the "safe harbor" provisions of Rule 11.

■ Even assuming that the Rule 11 procedural requirements were complied with, plaintiff has not established that the court should sanction defendant's conduct. Rule 11 requires that "any claims, defenses, and other legal contentions" must be "warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law." Fed.R.Civ.P. 11(b)(2). The rule also provides that "[m]onetary sanctions may not be awarded against a represented party" for frivolous arguments made by the party's legal counsel. Fed.R.Civ.P. 11(c)(2)(A).

4. Although plaintiff filed separately a memorandum of law in support of the Rule 11 motion, Plaintiff's Mem. in Support of its Cross-motion for Sanctions under Rule 11, Doc. 93, plaintiff's affidavit in support of the Rule 11 motion also was submitted in support of the other motions brought by plaintiff. Affidavit of William R. Hansen, Doc. 90.

With regard to defendant's legal basis for bringing the instant motions, plaintiff claims that defendant's assertion that federal common law supplies the rule of decision is wholly unsupported in cases involving the settlement of trademark and unfair competition cases. Doc. 93 at 8–9. In addition, plaintiff complains that defendant failed to address controlling statutory law. Doc. 93 at 9–10.

Despite defendant's unsuccessful attempt to persuade the court to enforce the alleged oral settlement, the motion was not frivolous. Both defendant and plaintiff provided facially-valid arguments in support of their respective positions. Furthermore, defendant was able to identify several cases in this jurisdiction to support the proposition that this court should not apply CPLR § 2104 in determining whether there existed a binding settlement agreement. *See e.g., Grupo Sistemas v. AT & T Communications, Inc.,* 1994 WL 463014 (S.D.N.Y. Aug. 24, 1994) (and cases cited therein). Furthermore, whether an oral settlement agreement of a Lanham Act claim is binding on the parties appears to be a question of first impression in this jurisdiction. As this court's discussion regarding the application of § 2104 illustrates, defendant's legal arguments were a reasonable attempt to convince the court that an oral settlement agreement of a Lanham Act claim could bind the parties.

The 1993 amendments to Rule 11 also revised the standard for factual contentions. Under former Rule 11, factual contentions had to be "well grounded in fact." Under the current version of the rule an attorney only is required to conduct "an inquiry reasonable under the circumstances" into whether "the allegations and other factual contentions have *evidentiary support*". Advisory Committee Note on 1993 Amendment (emphasis added); *Hadges,* 48 F.3d at 1330. With regard to the facts relied upon by defendant in support of the motion to enforce the alleged settlement agreement, both parties presented substantial evidence in support of their respective positions. Mr. Sears provided frank and detailed testimony as to what he believed had occurred during the private settlement conference. The fact that the court ultimately relied on key portions of

Mr. Thornton's testimony does not serve as a basis for imposing sanctions on defendant. In summary, defendant's motion to enforce an alleged oral settlement agreement had "evidentiary support," as required under Rule 11, and was sufficient to justify a hearing to resolve the dispute.

Lastly, the court notes that Rule 11 can be a double-edged sword; a party who files such a motion is subject to the same requirements and sanctions in making a motion under that rule. Advisory Committee Note on 1993 Amendment. Furthermore, a Rule 11 motion should not be made "for minor, inconsequential violations … [or] to intimidate an adversary into withdrawing contentions that are fairly debatable." *Id.* In this regard the court notes that plaintiff's understanding of Rule 11 is patently erroneous. Plaintiff both failed to comply with the rule's safe harbor provisions, as discussed above, and incorrectly represented the substantive legal requirements under Rule 11.

With regard to the substantive requirements, plaintiff argues that imposition of sanctions under Rule 11 is "mandatory". Plaintiff's Rule 11 Mem., Doc. 93, at 7. While the imposition of sanctions for a Rule 11 violation was mandatory under the former version, the 1993 amendments provide that the imposition of sanctions is discretionary. Fed.R.Civ.P. 11(c) and (c)(1)(B); *Knipe,* 19 F.3d at 75, 78; *Photocircuits Corp. v. Marathon Agents, Inc.,* 162 F.R.D. 449, 451 (E.D.N.Y.1995) ("In the final analysis, the imposition of sanctions by the Court … is left to the court's discretion.") (citations omitted)). Plaintiff also argues that defendant's motions are "not well grounded in fact." Plaintiff's Rule 11 Mem., Doc. 93, at 13. As the Second Circuit Court of Appeals stated, the "well grounded in fact" standard was replaced in the current version of the rule with the less stringent "evidentiary support" standard. *Hadges,* 48 F.3d, at 1330. In short, plaintiff's Rule 11 motion itself contains legal arguments that are not "warranted by existing law," and comes dangerously close to justifying the imposition of sanctions.

In summary, plaintiff's motion for Rule 11 sanctions is denied because plaintiff did not comply with the procedural requirements for

**410**

initiating the motion. With regard to the substantive bases for the motion, plaintiff has not shown that defendant's factual or legal assertions are not supported by existing law, or that defendant's factual contentions do not have evidentiary support.

### III. Summary Judgment of Defendant's Cross Claim for Damages

 Plaintiff next brings a cross motion for dismissal of defendant's second counterclaim. Although the court denied plaintiff's previous motion for summary judgment seeking dismissal of defendant's counterclaims, the court will consider the instant motion as properly brought under Fed.R.Civ.P. 56(a), as opposed to treating it as a motion for reconsideration.[5] Because an understanding of plaintiff's previous summary judgment motion is relevant to the instant motion, the court turns to a brief discussion of the prior motion.

 By Memorandum–Decision and Order dated July 8, 1993, this court denied plaintiff's motion to dismiss defendant's two counterclaims. Defendant's first counterclaim seeks a declaration that its use of the SEARS mark in connection with its petroleum business is superior to plaintiff's use of the mark. The second counterclaim seeks declaratory relief for common law trademark infringement and unfair competition allegedly arising from plaintiff's use of the SEARS mark on motor oil products. See Plaintiff's Mem. in Support of Motion for Summary Judgment, Doc. 93, at 3. Of particular relevance to the instant motion, defendant's second counterclaim also seeks damages. In this regard, defendant alleges that plaintiff's use of the SEARS mark in connection with the sale of motor oil is likely to cause "reverse confusion." Id. at 4.

In support of the previous summary judgment motion, plaintiff argued that defendant's counterclaim for trademark infringement should be dismissed as a matter of law because plaintiff was not "actively" using its mark in conjunction with retail gasoline sales in defendant's traditional trading area. Plaintiff also acknowledged that while it continues to sell SEARS brand motor oil in defendant's market, plaintiff has superior trademark rights to the use of the mark in connection with the sale of motor oil. Plaintiff's Mem. in Support of Summary Judgment, Doc. 67, at 33–34. According to plaintiff, the court should have dismissed the counterclaim because defendant was not suffering any harm at the time, and only could proffer the possibility of future harm. See Plaintiff's Mem. in Support of Summary Judgment, Doc. 67, at 33. Plaintiff argued that defendant failed to produce credible evidence necessary to support a finding that consumers identify the SEARS mark with defendant's products and services. See Plaintiff's Mem. in Support of Summary Judgment, Doc. 67, at 35. With regard to defendant's damages claim, plaintiff argued that unless there was a showing of active infringement "monetary damages simply [could] not occur," and that a jury trial with respect to the damages claim was unwarranted. See id., at 41.

In its July 8, 1993 MDO, this court held that summary judgment was inappropriate because genuine issues of material fact remained in dispute. In particular, the court noted that "[a]mong the disputed issues of fact preventing summary judgment is whether plaintiff is the senior user of the SEARS mark with regard to the sale of gasoline and

---

5. Plaintiff brought the instant motion for relief pursuant to Rule 56(d) of the Federal Rules of Civil Procedure. Reliance on that rule as a basis for the motion is misplaced. According to Rule 56(d), if a court finds that summary judgment cannot be granted because genuine issues of material fact exist, the court is empowered, when it would be practicable to save time and expense and to simplify the trial, to issue an order that specifies the facts that appear without substantial controversy. Hester Indus., Inc. v. Tyson Foods, Inc., 160 F.R.D. 15, 15 (N.D.N.Y. Feb. 5, 1995). The procedure prescribed in Rule 56(d), however, is designed to be *ancillary* to a motion for summary judgment, and is *not* to be invoked as an independent basis for relief. See 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2737, at 457 (2d ed. 1983) (emphasis added); Arado v. General Fire Extinguisher Corp., 626 F.Supp. 506, 509 (D.C.Ill.1985) (there is no such thing as an independent motion under Rule 56(d) to obtain partial summary judgment on part of a claim). Despite the obvious procedural infirmities, the court construes the instant motion as predicated on Rule 56(a).

motor oil." July 8, 1993 MDO, Doc. 79, at 7, 10, 14 (reported at *Sears Roebuck & Co. v. Sears Realty Co.,* No. 89–CV–1350, 1993 WESTLAW 260677, *12 (N.D.N.Y.1993)). The court also concluded that although defendant's amended answer did not specify the exact amount of alleged damages, defendant had sufficiently alleged monetary damages as a result of plaintiff's continued promotion and sale of motor oil in defendants' four-county trading area. *Id.*

The instant motion to dismiss defendant's damages claim is nothing more than a refinement of plaintiff's prior request to dismiss defendant's second counterclaim and to strike the jury demand. The court notes that both the previous and the instant motions are, in essence, predicated on the assertion that defendant cannot establish consumer confusion. Plaintiff's Mem. in Support of Summary Judgment, Doc. 95, at 11–14. It is well-settled law that "in order for a Lanham Act plaintiff to receive an award of *damages* the plaintiff must prove either actual consumer confusion or deception resulting from the violation, or that the defendant's actions were intentionally deceptive thus giving rise to a rebuttable presumption of consumer confusion." *George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532, 1537 (2d Cir.), *cert. denied,* 506 U.S. 991, 113 S.Ct. 510, 121 L.Ed.2d 445 (1992) (emphasis in original) (citations and internal quotations omitted). Plaintiff argues that the "actual confusion" that defendant must show is confusion in which consumers who purchase *plaintiff's* SEARS brand motor oil products believe that they are purchasing defendant's product. Plaintiff's Mem. in Support of Summary Judgment, Doc. 95, at 11–12. Plaintiff mistakes its own claim, however, with the claim asserted by defendants. In order to resolve the instant dispute, the court must distinguish between the types of consumer confusion that the Lanham Act was intended to remedy.

"The Lanham Act seeks to prevent consumer confusion that enables a seller to pass 'off his goods as the goods of another.'" *Lang v. Retirement Living Publishing Co., Inc.,* 949 F.2d 576, 583 (2d Cir.1991) (citations omitted); *W.W.W. Pharmaceutical Co.*

*v. Gillette Co.,* 984 F.2d 567, 574 (2d Cir. 1993). In contrast, to establish reverse confusion, as defendant alleges in its second counterclaim, the senior user must show that the junior user's selection of a mark "is likely to cause consumers to believe, erroneously, that the goods marketed by the [senior] user are produced by the subsequent user." *W.W.W. Pharmaceutical,* 984 F.2d at 574 (quoting *Lang,* 949 F.2d at 583 (internal quotations omitted)). Stated another way, reverse confusion occurs where

> the junior user saturates the market with a similar trademark and overwhelms the senior user. The public comes to assume the senior user's products are really the junior user's or that the former has become somehow connected to the latter. The result is that the senior user loses the value of the trademark—its product identity, corporate identity, control over its goodwill and reputation, and ability to move into new markets.

*Ameritech, Inc. v. American Information Technologies, Corp.,* 811 F.2d 960, 964 (6th Cir.1987).

The harm caused by reverse confusion involves "an erosion of goodwill and a loss of control over [one's] reputation, and as such is a more subtle injury than the customary diversion of trade engendered by direct confusion." *Lang,* 949 F.2d at 583.

Under a reverse confusion theory therefore, defendant Sears Oil first must show that it is the senior user of the mark SEARS in the subject market area, and second, that consumers erroneously believe that goods marketed by Sears Oil are actually produced by plaintiff Sears Roebuck. Plaintiff's argument therefore, that "defendants have failed to show even one instance of a consumer confusing *the plaintiff's product for those of defendants*" is not relevant to defendant's claim of reverse confusion. Plaintiff's Mem. in Support of Summary Judgment, Doc. 95, at 13 (emphasis added). That type of evidence is relevant to *plaintiff's* claim, under a direct confusion theory, that plaintiff is the senior user of the SEARS mark in connection with the sale of motor oil.

Summary judgment is not appropriate for two reasons. First, it is inappropriate be-

**412**

cause material issues of fact exist as to whether plaintiff or defendant is the senior user of the mark SEARS in the territory at issue. That is one of the reasons this court gave for denying plaintiff's previous summary judgment motion, and it remains a valid basis for denying plaintiff's instant motion. July 8, 1993 MDO, Doc. 79, at 14. More importantly, with respect to defendant's claim of reverse confusion, the court concludes that there exists a legitimate dispute as to a material issue of fact. Evidence tending to support defendant's reverse confusion theory, interestingly, was presented by plaintiff in support of its previous summary judgment motion. In particular, in arguing that plaintiff has demonstrated the existence of actual confusion among consumers, plaintiff summarized the following evidence presented during a hearing before this court:

Plaintiff produced three witnesses who testified at the evidentiary hearing that they were confused about the relationship between the plaintiff and the "Sears Express Shoppes" in Mattydale, Bridgeport and Rome. Plaintiff also filed four (4) other affidavits from local residents attesting to their confusion arising from defendants' use of the mark "Sears Express Shoppes". Furthermore, according to an affidavit submitted to the Court by an ex-employee of the defendants, *a significant number of consumers had attempted to use their SEARS credit cards to purchase goods and services from the defendants.*

Plaintiff's Mem. in Support of Summary Judgment, Doc. 67, at 27 (emphasis added). Assuming that defendant Sears Oil is the senior user of the mark, this evidence tends to support defendant's reverse confusion claim, that consumers believed that goods marketed by defendant are actually produced by plaintiff. In addition, defendant points to the deposition testimony of several of plaintiff's employees which tends to establish reverse confusion. Def.'s Mem. of Law Opposing Plaintiff's Motion for Summary Judgment, Doc. 100, at 8–10. Because there exists a genuine issue of material fact with regard to who is the senior user of the SEARS mark, and whether the requisite confusion exists necessary to support defendant's reverse confusion claim, the court con-

cludes that summary judgment is inappropriate at this time. Plaintiff's motion to dismiss defendant's damages claim is therefore denied.

## CONCLUSION

Defendant Sears Oil's motion to enforce an alleged oral settlement agreement, and to dismiss the present lawsuit in its entirety is DENIED. Plaintiff's cross motions for summary judgment of defendant's damages claim, and for sanctions are DENIED.

It is so Ordered.